SARAH JANE McGUCKIN, Indiv. and as Ex'r of the Estate of William J. McGuckin, Deceased, Plaintiff-Appellee, v. CHICAGO UNION STATION, *et al.*, Defendants-Appellants (Consolidated Rail Corporation, Defendant-Appellee).

First District (4th Division)   Nos. 1—87—1238, 1—87—1292 cons.

Opinion filed November 30, 1989.

984

Judson H. Miner, Corporation Counsel, of Chicago (Ruth M. Moscovitch and Joanne Simboli Hodge, Assistant Corporation Counsel, of counsel), for appellant City of Chicago.

Romanyak & Miller, of Chicago (James A. Romanyak, Lawrence T. Miller, and Gregory A. Stayart, of counsel), for appellant Chicago Union Station.

Leo M. Tarpey, Jr., and Catherine Coyne Reiter, both of Pretzel & Stouffer, of Chicago (Robert Marc Chemers and Perry W. Hoag, of counsel), for appellee Sarah Jane McGuckin.

Baker & McKenzie, of Chicago (Francis D. Morrissey, John W. Dondanville, and William M. Sneed, of counsel), for appellee Consolidated Rail Corporation.

JUSTICE JOHNSON delivered the opinion of the court:

After a jury trial, defendants, City of Chicago (hereinafter the City) and Chicago Union Station (hereinafter Union Station), were found liable for the death of William J. McGuckin. Defendants appeal from the judgment of the circuit court of Cook County that apportioned liability at 60% against the City and 40% against Union Station. The major issue raised on review by the City is whether the trial court erred in finding that the City owed a duty to decedent. The other issue raised by the City is whether the trial court erred by allowing the jury to determine if a "special duty" existed without instructing the jury as to the necessary elements of that duty. On appeal, Union Station questions whether (1) the jury verdicts in favor of Consolidated Rail Corporation and against it are inconsistent; (2) the verdict against it (Union Station) was against the manifest weight of the evidence; (3) the trial court erred by imposing the Local Governmental and Governmental Employees Tort Immunity Act (Ill. Rev. Stat. 1985, ch. 85, par. 5—101 *et seq.*) as a bar to its third-party complaint for contribution from the City; (4) there was sufficient evidence based upon a theory of *res ipsa loquitur* to support a denial of its motion for a directed verdict; and (5) the trial court abused its discretion by allowing plaintiff's expert witnesses to testify.

We affirm in part and reverse in part.

Plaintiff's decedent, William J. McGuckin, was an employee of Consolidated Rail Corporation (hereinafter Conrail). Union Station leased space in its building to Conrail. On July 26, 1980, a fire occurred at Union Station and McGuckin died from smoke inhalation. On July 27, 1981, plaintiff filed a five-count complaint seeking $1,500,000 on behalf of herself individually and as executor of McGuckin's estate. Count IV alleged that the City engaged in 10 negligent acts or omissions. On October 16, 1981, the City filed a motion to strike and dismiss count IV based on the Local Governmental and Governmental Employees Tort Immunity Act (Ill. Rev. Stat. 1985, ch. 85, par. 5—101 *et seq.*) (hereinafter the Tort Immunity Act or Act). After a hearing on the City's motion to dismiss, the court found that the law would not impose liability against the City for failure to sufficiently inspect or extinguish the fire. However, the court did not strike subparagraph 22(e) of count IV, which alleged that the City negligently instructed the occupants to remain in the building.

On August 11, 1982, the trial court granted plaintiff leave to amend count IV of her complaint. The amendment alleged that the City owed decedent a "special duty." The City filed a motion to dismiss the amendment on August 22, 1985. The court granted the motion with respect to all of the allegations except those contained in paragraphs 22(a) and 22(b), which alleged that the City instructed or advised the occupants to remain in the building. The City filed a petition for reconsideration of its motion to dismiss, a motion to vacate the order entered on June 17, 1982, and another motion to dismiss. After a hearing on June 6, 1986, the court denied the City's petition for reconsideration.

On September 9, 1986, the City filed a motion for summary judgment. Prior to a decision on the motion, plaintiff moved to file, *instanter*, an amended complaint and her motion was granted. Before trial began, Union Station filed a motion to strike and dismiss count I of plaintiff's amended complaint that added the claim of *res ipsa loquitur*, which was denied. The trial court also dismissed two of the parties, and the case proceeded to trial against defendants herein. The facts are taken from the trial testimony.

Jordan Riehecky, a janitor at Union Station at the time of the fire, testified that usually when he arrived at work, around 6 a.m., he found trash carts near the loading dock. It was his responsibility to take the carts to a trash compactor. On the day of the fire, he also noticed new bags of sawdust stacked against a wall in the loading dock area. He removed all but one or two of the trash carts from the loading dock by 7 a.m. He stated that he was unable to remove all of the carts because of the amount of trash on the floor. He did not smell any smoke during this time. He did hear a popping sound which alerted him to the possibility of a fire. He pulled the fire alarm and ran upstairs. Riehecky testified that he had never received any training concerning procedure in case of a fire.

At approximately 10:40 a.m. on July 26, 1980, Carl Thomas, a security officer at Union Station, was advised by a janitor that the basement smelled of smoke. Robert Krabec, the acting supervisor of the security officers, directed Thomas and Coleman Smith, also a security officer, to go down to the basement and investigate the matter. As Thomas approached the loading dock area, he saw smoke near the ceiling and felt the heat. When Thomas looked through the doors into the loading dock, he saw flames. Krabec ordered Thomas and Smith to contact the fire department. The fire department arrived in approximately 20 minutes. The fire was brought under control within 10 minutes. Thereafter, the fire fighters proceeded to check for any ex-

tension of the fire.

James Higgins, the chief of Battalion 2 and ranking officer of the fire department, ordered the fire fighters to check the ceiling around an electrical chase (a boxed area contained inside a large structure and through which various pipes run), whose shaft led to the upper floors. Next, Higgins obtained a ladder which enabled him to look up the chase for evidence of smoke or a red glow. Captain O'Hara, in charge of Engine Company 1, climbed the ladder with a flashlight. He shut the flashlight off to see if any sparks were falling. He told Higgins that the area was clear. Higgins then ordered the fire fighters to climb the ladder with a hose and wash down the chase. Fire fighters were also sent to the roof to check for any extension of the fire.

Higgins was notified by radio that there was a person on the seventh floor who might be in jeopardy. He ordered Thomas Loughney, a lieutenant with the fire department, to investigate the matter. Loughney was accompanied by a Union Station security guard. The two men left the loading dock and went upstairs to the main lobby, where they stopped at the Golden Lion Restaurant. The doors were locked. The guard informed Loughney that he did not have the keys, but that he could obtain them. Loughney made no request for the keys; instead, he looked into the restaurant through the glass doors, seeing at a distance of 20 to 25 feet with the use of his flashlight. He did not see smoke or fire or feel heat up against the doors. The guard did not inform Loughney that the restaurant was above the area of the basement where the fire had just occurred. Thereafter, Loughney and the guard went to the seventh floor.

On the seventh floor, light smoke was visible and the area was ventilated. The guard departed, and Loughney proceeded to the lower floors, opening hallway and stairwell doors for further ventilation. Lieutenant Loughney did not converse with any of the occupants. When he returned to the first floor, he reported to Higgins that upon his visual inspection of the restaurant, through its locked doors, he saw no evidence of a fire. Higgins testified that neither he nor any of the fire fighters informed the tenants that it would not be necessary to evacuate the building. He further testified that he did not remember a conversation with Krabec concerning the people on the upper floors complaining of smoke. However, Thomas testified that he heard Krabec and Higgins arguing about the people on the upper floors who complained of smoke. Thomas alleged that he heard them advise the people not to worry because the fire was only in the basement.

McGuckin shared a fifth-floor office suite with Mary Banhart and Arthur Bridenstine. Between 9 and 10 a.m., employees on the fifth

floor saw smoke in the corridors. Charlotte Bader, an employee who worked in Conrail's dispatch office, went to the suite and informed McGuckin and the others that there was a fire downstairs. Allan Cravens, another Conrail employee, testified that he spoke with Joe Schulberger, Conrail's assistant superintendent of operations, who informed him that he had spoken with Union Station personnel and was assured that the small fire was under control. As McGuckin and Bridenstine left the suite to get a report on the fire, they met a group of Conrail employees exiting an elevator and were told that there had been a fire downstairs but the fire department had extinguished it.

Banhart further testified that around noontime she went to the ladies room, where she found the window open and the smell of smoke prevalent. She went to McGuckin's office and pointed to the smoke outside. She suggested that they leave. According to Banhart, McGuckin had difficulty getting to the main office due to the thick smoke in the corridor. She eventually reached out into the hallway and brought him into the main office. McGuckin contacted Cravens and told him they were trapped. All except McGuckin went out onto the office window ledge. Banhart tried, but failed, to get McGuckin onto the ledge. He subsequently collapsed.

At approximately 11:37 a.m., the fire fighters left Union Station. About 20 minutes later, Thomas went to the main waiting room of Union Station, where he learned from a Faber's Restaurant employee that the smell of smoke was strong in the nearby Falcon Lounge. Thomas went to the Falcon Lounge and saw the smoke. He attempted to enter the Golden Lion Restaurant next door, but the doors were locked. However, he could see smoke through the glass doors. Krabec sent Thomas to obtain the keys. Both men entered the restaurant. Thomas saw a blaze of fire and shouted out to Krabec to get the fire department back. Thomas immediately began to evacuate the main waiting room. Thomas testified that he was aware of only one system of notifying tenants in case of an emergency, and that system was out of order on the day of the fire.

When the fire fighters arrived again, Higgins ordered an evacuation of the building. The thick smoke prevented Thomas from going upstairs to warn the tenants on the upper floors. Once outside the building, Thomas informed a fire fighter that there might be some people upstairs. A fire fighter rescued the Conrail employees from the window ledge.

Dr. Yuksie Konakci, a medical examiner with the Cook County medical examiners office, testified that McGuckin died from smoke inhalation.

The cause of the fire was in dispute at trial. James Ryan, who was employed by the Chicago fire department as an assistant commissioner and director of inspectional services at the time of the fire, testified that the basement fire was caused by an electrical malfunction. He stated that the fire in the restaurant originated in the area of the electrical chase. He further concluded that placing sawdust and full trash carts near the electrical closet created a fire hazard. Ryan stated that a fire doubles itself in volume approximately every three minutes. According to the witness, the failure of the fire fighters to detect the fire between 11 and 11:30 a.m. increased the danger of death from smoke inhalation on the fifth floor. If the fire had been discovered around 11:10 a.m., Ryan stated that it would have taken the fire fighters only 10 to 15 minutes to bring it under control.

Henry Morton, a registered professional engineer, was retained by the General Adjustment Bureau of Chicago, Union Station's insurance carrier, to inspect and investigate the fire. Morton found two probable causes of the fire: (1) spontaneous ignition and (2) human activity, *i.e.*, someone dropping smoking materials into the trash, in the area of the basement fire. He ruled out electrical malfunction as the cause of the fire. Even if there were a malfunction, he found no fuel in the chase at that time to start an ignition reaction. Morton believed that the fire originated in the sawdust or in the dumpster outside the electrical panel in the basement. He stated that leaving carts filled with trash in an enclosed area near the electrical chase was a fire hazard.

Boyd A. Hartley, a protection and safety engineer, testified as an expert witness. He was asked to review the documents and reports of Morton and Ryan and to render an opinion concerning the fire at Union Station. Similar to the opinions stated by Morton and Ryan, Hartley believed that the origin of the fire was the trash carts located near the electrical chase in the basement.

John Kennedy, a fire and explosion investigator, also testified as an expert witness. He conducted an investigation at the scene of the fire, reviewed materials in possession of the bomb and arson squad, conducted interviews, and analyzed reports prepared by other fire investigators. Kennedy testified that the fire originated in the trash carts in front of the electrical chase in the basement. He did not find that the fire was caused by an electrical malfunction. However, he stated that placing open trash carts in the area of the loading dock was not a fire hazard because it was not proximate to any source of ignition.

All of the experts agreed that the overhaul conducted by the fire fighters was improper. A proper overhaul would have prevented the

fire from spreading.

The City contends, on appeal, that the trial court erred in finding that it owed a duty to decedent. It argues that, pursuant to the Tort Immunity Act, fire fighters are immune from liability for the "failure to establish a fire department or *** provide fire protection service." (Ill. Rev. Stat. 1985, ch. 85, par. 5—101.) The Act further provides that fire fighters are not liable "for an injury resulting from the failure to suppress or contain a fire or from the failure to provide or maintain sufficient personnel, equipment or *** facilities" (Ill. Rev. Stat. 1985, ch. 85, par. 5—102), nor "for an injury caused by an act or omission of a public employee while engaged in fighting a fire" (Ill. Rev. Stat. 1985, ch. 85, par. 5—103).

Plaintiff concedes that the above sections of the Act provide a blanket grant of immunity to local governments from liability for injuries arising from the ordinary negligence of fire fighters. (*Jackson v. Chicago Firefighters Union* (1987), 160 Ill. App. 3d 975, 980; *Adams v. Brooks* (1984), 123 Ill. App. 3d 840, 844.) Nevertheless, plaintiff claims that the facts of this case fall within the "special duty" exception to the statutory immunity for fire fighters.

The sound public policy behind the immunity statute has been reiterated in various cases in Illinois. In *Martin v. Lion Uniform Co.* (1989), 180 Ill. App. 3d 955, 959, quoting *Roumbos v. City of Chicago* (1928), 332 Ill. 70, 81, quoting *Wilcox v. City of Chicago* (1883), 107 Ill. 334, 339, the court stated:

> " 'If liable for neglect in this case the city must be held liable for every neglect of that [fire] department, and every employee connected with it when acting within the line of duty. It would subject the city to the opinions of witnesses and jurors whether sufficient dispatch was used in reaching the fire after the alarm was given; whether the employees had used the requisite skill for its extinguishment; whether a sufficient force had been provided to secure safety; whether the city had provided proper engines and other appliances to answer the demands of the hazards of fire in the city; and many other things might be named that would form the subject of legal controversy. To permit recoveries to be had for all such and other acts would virtually render the city an insurer of every person's property within the limits of its jurisdiction. It would assuredly become too burthensome to be borne by the people of any large city, where loss by fire is annually counted by the hundreds of thousands, if not by the millions. *** To allow recoveries for the negligence of the fire department would almost certainly sub-

ject property holders to as great, if not greater, burthens than are suffered from the damages from fire. Sound public policy would forbid it, if it was not prohibited by authority.' "

■ Contrary to the City's argument, the special duty exception is applicable to fire fighters. (*Huey v. Town of Cicero* (1969), 41 Ill. 2d 361; *Jackson v. Chicago Firefighters Union* (1987), 160 Ill. App. 3d 975.) However, the issue before us is whether the special duty exception is applicable to the case at bar. The following four-prong test must be satisfied before imposition of the special duty exception: (1) the municipality must be uniquely aware of the particular danger or risk to which the decedent was exposed: (2) there must be allegations of specific acts or omissions on the part of the municipality; (3) the specific acts or omissions must be either affirmative or willful in nature; and (4) the injury must occur while the plaintiff's decedent was under the direct and immediate control of employees or agents of the municipality. *Marvin v. Chicago Transit Authority* (1983), 113 Ill. App. 3d 172, 176; *Bell v. Village of Midlothian* (1980), 90 Ill. App. 3d 967, 970.

■ Assuming, *arguendo*, that plaintiff could satisfy the second and third elements of the above test, she has failed to produce sufficient evidence to meet the remaining two elements. In order to find "unique awareness," the municipality must be on notice "that a preventable danger threatens a particular individual of whom they are aware." *Fryman v. JMK/Skewer, Inc.* (1985), 137 Ill. App. 3d 611, 617; see also *Huey*, 41 Ill. 2d at 364.

In *Huey*, the plaintiff alleged that the City had a duty to warn the decedent, a black person, of the dangers of being in the town of Cicero. The court held that the plaintiff failed to show that defendants knew of the presence of decedent in Cicero, or that the decedent had requested protection, or that the decedent would encounter any particular danger. (*Huey*, 41 Ill. 2d at 364.) Furthermore, in *Fryman*, the county health department learned that a restaurant was serving contaminated food; however, it did not close the restaurant or warn the patrons of possible food poisoning. The court found that the county was not uniquely aware of the danger to any specific individuals. *Fryman*, 137 Ill. App. 3d at 617.

Here, plaintiff claims that when Higgins was informed by Union Station's security officer that some people saw smoke in the building, he was uniquely aware that particular individuals were exposed to danger. This evidence is insufficient to meet the unique awareness requirement. It is very likely that Higgins believed that the smoke was a result of the fire in the basement. We find that the fire fighters

were not uniquely aware of any specific danger to the decedent; the record does not disclose that they knew of his existence on the premises nor did they receive from him a request for protection.

■ We also conclude that the evidence fails to support a finding that the decedent was under the direct and immediate control of the fire department. In determining the control prong of the special duty exception, the issue is whether the municipality "was responsible for the occurrence which gave rise to the need for protection." (*Jackson v. Chicago Firefighters Union* (1987), 160 Ill. App. 3d 975, 982; see *Cincinnati Insurance Co. v. City of Taylorville* (7th Cir. 1987), 818 F.2d 1345, 1352.) The mere fact that the municipality is aware of another's need for protection is not a conclusive finding of direct and immediate control. *Jackson*, 160 Ill. App. 3d at 982.

In *Gardner v. Village of Chicago Ridge* (1966), 71 Ill. App. 2d 373, the plaintiff was asked by police officers to accompany them to a specific location to identify persons who had assaulted him. The plaintiff was attacked again by his assailants in the presence of the police officers. On appeal, this court reversed the dismissal of the complaint on the basis that plaintiff had been "called into a position of peril by the police." *Gardner*, 71 Ill. App. 2d at 380.

On the other hand, in *Marvin v. Chicago Transit Authority* (1983), 113 Ill. App. 3d 172, the plaintiff was being attacked near the cashier's window in a subway station. A Chicago police officer chased the youths away, but refused plaintiff's request to accompany him down to the platform. The officer stated that the youths were going in a different direction. However, when plaintiff reached the platform, the youths were waiting and he was severely beaten. The appellate court affirmed the dismissal of the plaintiff's complaint, holding that "[t]he mere disjunctive allegation that the police officer 'directed, permitted or caused' plaintiff to descend to the platform *** does not meet this *** requirement." (*Marvin*, 113 Ill. App. 3d at 177.) The case law indicates that in order for the court to find that the decedent was under the "direct and immediate control of employees *** of the municipality," plaintiff has to show that an employee or agent of the municipality took an affirmative action which called the injured party into a position of peril. *Marvin*, 113 Ill. App. 3d at 176.

Here, plaintiff urges that evidence of the fire department's immediate control can be found in sections 12—37 and 12—38 of the Municipal Code of Chicago (Chicago Municipal Code §§12—37, 12—38 (1984)). In essence, these sections provide that all persons in the area of a fire are subject to the orders of the chief fire marshal and that the chief has the power to prescribe and maintain the limits in the

area in which no person may enter without his permission. Plaintiff alleges that the City was negligent in instructing or advising the occupants that the building was safe, when in fact it was not. Plaintiff's support of this allegation is based on the testimony of Union Station's security guard, Carl Thomas. According to Thomas, two Conrail employees overheard a conversation wherein Higgins allegedly stated that the fire was out and there was no need for evacuation. The facts suggest that possibly these Conrail employees may have been the same Conrail employees who told McGuckin and his co-workers that the fire was out and that it was safe to remain in the building. Yet, there is no testimony in the record from a Conrail employee stating that he or she overheard such a conversation.

The facts fail to reveal any situation where the fire fighters acted affirmatively to call McGuckin into a position of peril by ordering, instructing, or advising tenants to remain in the building. Moreover, an overheard conversation by a third party related to another party is far removed from constituting direct and immediate control. Clearly, the decedent was not under the direct and immediate control of the fire department. For these reasons, plaintiff has failed to meet the requirements necessary for the imposition of a special duty. Based on this finding, there is no need to reach the other contentions raised by the City.

Initially we will address Union Station's claim against Conrail. As a part of its appeal from the judgment in favor of plaintiff and against it, Union Station contends that the verdicts in favor of Conrail and against it are inconsistent. Under Illinois law a defendant has no standing to appeal a verdict in favor of a codefendant. (*Landers v. Ghosh* (1986), 143 Ill. App. 3d 94, 99; *Pell v. Victor J. Andrew High School* (1984), 123 Ill. App. 3d 423, 435.) Where a defendant asserts a cross-claim for contribution against a codefendant, the defendant may have standing to appeal dismissal of joint tortfeasors in the underlying action at the trial level. *Pell*, 123 Ill. App. 3d at 435.

In the present case, Union Station and Conrail held in abeyance their contribution claims against each other. The jury rendered a verdict only on plaintiff's claims against the three defendants. The rule of law in Illinois states that the same jury hearing a single set of facts and circumstances cannot reach two distinct conclusions of fact as set forth in their verdicts, unless those inconsistent conclusions are reconcilable under an applicable rule of law. *Boasiako v. Checker Taxi Co.* (1986), 140 Ill. App. 3d 210, 213.

We find that the verdicts in the instant case are reconcilable. Plaintiff here asserted a negligence claim under the theory of *res ipsa*

*loquitur* against Union Station, but not against Conrail. As the owner of the building, Union Station was subject to a claim that the premises were under its control, an essential element of *res ipsa loquitur*.

In *Drewick v. Interstate Terminals, Inc.* (1969), 42 Ill. 2d 345, the court reached the same conclusion. The plaintiff in *Drewick* filed a suit against a window manufacturer and a window installer for negligence. The plaintiff also sued the owner of the building where the window was installed, under the theory of *res ipsa loquitur*. The jury returned verdicts in favor of the window manufacturer and window installer and against the owner of the building. The owner contended that the verdicts were inconsistent. The court held that "the apparent inconsistency of the verdicts in question is resolved since no attempt was made to apply the doctrine of *res ipsa loquitur* to the other party-defendants." (*Drewick*, 42 Ill. 2d at 348.) The merits of the theory of *res ipsa loquitur* will be discussed later in this opinion.

Union Station contends that it is entitled to contribution from the City, pursuant to section 2(a) of the Contribution Among Joint Tortfeasors Act (hereinafter the Contribution Act) (Ill. Rev. Stat. 1985, ch. 70, par. 302(a)). It argues that even assuming that the Tort Immunity Act is applicable, it is not a bar to claims for contributions.

By the express terms of the Contribution Act, we disagree with Union Station. Section 2(a) of the statute provides that, "Except as otherwise provided in this Act, where 2 or more persons are subject to liability in tort arising out of the same injury to person or property *** there is a right of contribution among them ***." (Ill. Rev. Stat. 1985, ch. 70, par. 302(a).) The above provision expressly provides that there is no right of contribution against a party who is not "subject to liability in tort." "The contribution defendant must be a tortfeasor, and originally liable to the plaintiff. If there was never any such liability, as where the contribution defendant has the defense of family immunity, assumption of risk, *** then there is no liability ***." (W. Prosser & W. Keeton, Torts §50, at 339-40 (5th ed. 1984).) It is well settled in Illinois "that a municipality owes no duty for negligence in connection with the governmental function of providing fire protection service. [Citation.] That rule of nonliability *** was born of sound public policy and was designed as a bar to all liability, where sought through a direct action or a third party contribution action." *McShane v. Chicago Investment Corp.* (1989), 190 Ill. App. 3d 357, 359.

Union Station relies on language indicating that the intent of the Contribution Act is "to reach anyone who is culpable regardless of whether they have been immunized from a direct tort action by some

special defense or privilege." (*Doyle v. Rhodes* (1984), 101 Ill. 2d 1, 9.) This court has on prior occasions explained, in distinguishing cases relying on this broad statement, that where contribution is sought from the State, different considerations came into play. See *Stephens v. Cozadd* (1987), 159 Ill. App. 3d 452; *Welch v. Stocks* (1987), 152 Ill. App. 3d 1.

We have already established above that the fire department did not owe a statutory duty or common law duty to the decedent. Absent the presence of one of the duties, the City and its fire department cannot be "liable in tort" under the Contribution Act.

■ Union Station next contends that the jury verdict against it was against the manifest weight of the evidence. It argues that the fire department's negligence in representing that the fire was extinguished and that it was safe to remain in the building constituted a superseding cause of McGuckin's death.

The rules applicable here regarding proximate cause were set forth in *Neering v. Illinois Central R.R. Co.* (1943), 383 Ill. 366, 381, as follows:

> "The rule that the causal connection between a person's negligence and an injury is broken by the intervention of a new, independent, efficient and intervening cause so that the negligence is not actionable is subject to the qualification that if the intervening cause was foreseen or reasonably might have been foreseen by the wrongdoer, his negligence may be considered the proximate cause of the injury and he may be held liable notwithstanding the intervening cause."

(See also *Bentley v. Saunemin Township* (1980), 83 Ill. 2d 10, 15.) Each case must rely on its own facts and surrounding circumstances. (*Davis v. Marathon Oil Co.* (1976), 64 Ill. 2d 380, 395.) Additionally, proximate cause of an injury is generally a question of fact to be determined by a jury. (*Neering*, 383 Ill. at 381.) In order for Union Station to escape liability, it must establish as a matter of law that the intervening occurrence was unforeseeable. *Davis*, 64 Ill. 2d at 395.

In our judgment, there was an unbroken causal connection between Union Station's negligence and McGuckin's death. The facts reveal that the fire was ignited by trash stored in proximity to the electrical chase in the basement of Union Station. Furthermore, there was ample testimony at trial that Union Station had only one alarm system for notifying occupants of an emergency and that system was out of order on the day of the fire. Clearly the fire department's overhaul of the fire is not a new or independent intervening cause to break the causal connection between Union Station's negligence and

McGuckin's death so as to relieve it from liability. In some instances there may be more than one proximate cause of an injury, and this may well be such a case. (*Bentley v. Saunemin Township* (1980), 83 Ill. 2d 10, 17.) However, we cannot say that the fire department's action was the sole proximate cause of McGuckin's death. Thus, the verdict was not against the manifest weight of the evidence.

Next, we address Union Station's contention that the trial court erred in denying its motion for a directed verdict on the *res ipsa loquitur* count of plaintiff's amended complaint. Union Station urges that when all the evidence is considered it cannot be inferred that McGuckin died as a result of the first fire. It urges that negligence is inferable from the acts of the fire department in failing to extinguish the second fire and informing the occupants that the fire was out.

A trial judge may grant a directed verdict "only in those cases in which all of the evidence, when viewed in its aspect most favorable to the opponent, so overwhelmingly favors movant that no contrary verdict based on that evidence could ever stand." (*Pedrick v. Peoria & Eastern R.R. Co.* (1967), 37 Ill. 2d 494, 510.) A directed verdict is proper only where no substantial factual disputes exist. *Pedrick*, 37 Ill. 2d at 504.

*Res ipsa loquitur* creates a permissible inference of negligence from otherwise inexplicable facts and circumstances by permitting proof of negligence by way of circumstantial evidence. (*Imig v. Beck* (1986), 115 Ill. 2d 18, 30.) In order to invoke the doctrine of *res ipsa loquitur*, plaintiff must prove (1) that the occurrence is one that ordinarily would not occur in the absence of negligence and (2) that the defendant had exclusive control of the instrumentality that caused the injury. (*Metz v. Central Illinois Electric & Gas Co.* (1965), 32 Ill. 2d 446, 448-49; *Imig*, 115 Ill. 2d at 26.) "A plaintiff need not conclusively prove all the elements of *res ipsa loquitur* in order to invoke the doctrine. He need only present evidence reasonably showing that elements exist that allow an inference that the occurrence is one that ordinarily does not occur without negligence. [Citation.]" (*Dyback v. Weber* (1986), 114 Ill. 2d 232, 242.) The application of the doctrine is a question of law to be determined by the trial judge. (*Metz*, 32 Ill. 2d at 449-50.) Upon that decision, it is the function of the trier of fact to weigh the strength of the inference of negligence. (*Imig*, 115 Ill. 2d at 27; *Drewick v. Interstate Terminals, Inc.* (1969), 42 Ill. 2d 345, 349.) The inference of negligence is not alleviated if defendant produces evidence to the contrary, but the evidence he presents will be considered with all the other evidence in the case. *Dyback*, 114 Ill. 2d at 242.

Initially we note that the mere occurrence of a fire is gener-

ally insufficient to invoke the doctrine; however, a fire in conjunction with certain surrounding circumstances may give rise to an inference of negligence. (*Hahn v. Eastern Illinois Office Equipment Co.* (1976), 42 Ill. App. 3d 29, 31.) Union Station argues that the facts of the case should be characterized as having two occurrences—the basement fire and the restaurant fire. Union Station argues that based on the facts of this case, it is only the second fire which does not ordinarily occur in the absence of negligence. Such negligence, it argues, is inferable from the acts of the fire department.

We disagree with Union Station's insistence that the fires are two separate and distinct occurrences. Simply because the restaurant fire was not discovered in the process of overhauling the fire in the basement does not make them distinct occurrences. We choose to view the circumstances as one fire in two different locations. All of the experts, including Union Station's expert, testified that the restaurant fire was a continuation of the fire in the basement.

We find sufficient evidence in the record to support an inference of negligence on behalf of Union Station. Each expert testified that the fire originated in the trash carts or the bags of sawdust which were located near an electrical chase in the basement. Essentially, all of the experts stated that this created a fire hazard. The fire thereafter was drawn vertically through the pipe chase to the above floors.

The only evidence presented by Union Station to refute the above inference of negligence was the expert testimony of John Kennedy, a fire investigator. He agreed that the origin of the fire was in the trash carts near the electrical chase. Thus, we find sufficient evidence in the record to support the inference that the occurrence under the facts of this case is one that ordinarily does not take place in the absence of negligence.

Union Station further contends that there was insufficient evidence that it had exclusive control of the instrumentality which caused McGuckin's death. It argues that the instrumentality is not the place of the fire, but the cause of the fire. As noted above, Union Station claims that McGuckin's death was not caused by the basement fire, but by the fire in the restaurant, which was under the control of the fire department.

"The reason for the exclusive control requirement is that it must appear that the negligence of which the doctrine warrants an inference is probably that of defendant and not of another. [Citation.]" (*Loizzo v. St. Francis Hospital* (1984), 121 Ill. App. 3d 172, 176; see also *Lynch v. Precision Machine Shop, Ltd.* (1982), 93 Ill. 2d 266, 274.) The degree of control necessary to satisfy the doctrine of *res*

*ipsa loquitur* is stated by Prosser and Keeton: " 'Control,' if it is not to be pernicious and misleading, must be a very flexible term. It may be enough that the defendant has the right or power of control, and the opportunity to exercise it ***. It is enough that the defendant is under a duty which he cannot delegate to another ***." W. Prosser & W. Keeton, Torts §39, at 250 (5th ed. 1984).

The Illinois courts have adopted the flexible standard of control. (*Lynch*, 93 Ill. 2d at 274.) Accordingly, the key question is whether the probable cause for the injury is of the kind which defendant was under a duty to the plaintiff's decedent to anticipate or guard against. *Lynch*, 93 Ill. 2d at 274; *Loizzo*, 121 Ill. App. 3d at 177; see Restatement (Second) of Torts §328D, comment *g*, at 161 (1965).

As mentioned previously, we view the circumstances of this case as involving one fire occurring in two different locations. The record shows that the exact cause of the fire is disputed; however, we do know where the fire originated. The record also reveals that Union Station's location of trash carts and sawdust near the electrical chase created a hazardous condition. Exclusive control does not mean physical control "if the instrumentality or dangerous agency is one which it is defendant's responsibility to maintain at all times and which responsibility cannot be delegated by consent, agreement or usage." *Metz v. Central Illinois Electric & Gas Co.* (1965), 32 Ill. 2d 446, 450.

Here, Union Station was responsible for the maintenance of its property. To this extent, it had a duty to use due care to guard against hazardous conditions. The fire department had no responsibility with regard to the trash carts or bags of sawdust, or the electrical chase located within Union Station. Neither could the fire department accept responsibility for these items and their location. Under these circumstances Union Station must be held to have had control over the instrumentality which caused McGuckin's death.

In conclusion, we are mindful that the doctrine of *res ipsa loquitur* only gives rise to a permissive inference of negligence. For this reason, in most cases a directed verdict will not be appropriate because it must be left to the trier of fact whether to draw the inference from the circumstances surrounding the occurrence. (*Imig v. Beck* (1986), 115 Ill. 2d 18, 29.) As noted by Prosser and Keeton:

> "[T]here may be occasional cases, such as those of the human toe in the plug of chewing tobacco, the collision of railway trains trying to run on the same track, and perhaps a rear end collision with a stationary vehicle, where the inference of negligence is so clear that no reasonable man could fail to accept it; and in such cases, if the defendant offers no explanation, a ver-

dict should be directed ***." (W. Prosser & W. Keeton, Torts §40, at 258 (5th ed. 1984).)

When viewing the evidence most favorably to plaintiff, the evidence fails to overwhelmingly favor Union Station. Thus, the trial court properly denied Union Station's motion for a directed verdict.

Union Station's final contention is that the trial court erred and abused its discretion, pursuant to Supreme Court Rule 220 (107 Ill. 2d R. 220), in failing to exclude the expert testimony of plaintiff's witnesses. According to Union Station, Ryan and Morton should have been excluded as expert witnesses because they were not properly disclosed. Additionally, Union Station argues that Hartley's expert testimony should have been barred since it was allegedly different from his deposition testimony.

Supreme Court Rule 220 governs the disclosure of expert witnesses. An expert witness "is a person who, because of education, training or experience, possesses knowledge of a specialized nature beyond that of the average person on a factual matter material to a claim or defense in pending litigation and who may be expected to render an opinion within his expertise at trial. *** [T]he identity of an expert who is retained to render an opinion at trial on behalf of a party must be disclosed by that party ***." (107 Ill. 2d R. 220.) The rule applies only to those experts who are "retained to render an opinion at trial." (*Diminskis v. Chicago Transit Authority* (1987), 155 Ill. App. 3d 585, 590-91.) Moreover, the trial court is afforded great latitude in allowing expert testimony which would enable the triers of fact to better understand the issues. *Gordon v. Chicago Transit Authority* (1984), 128 Ill. App. 3d 493, 503-04.

The facts indicate that at the time of the fire Ryan was employed by the Chicago fire department as an assistant commissioner. In that capacity, one of his responsibilities was to investigate the fire and prepare a report stating whether or not proper procedures were followed in handling the fire. Henry Morton, a registered professional engineer and an expert in fires, was retained by Union Station's insurance carrier to investigate the fire. Thus, according to the record, Ryan and Morton were not "retained to render an opinion at trial." For this reason, the City was not required to disclose them pursuant to Supreme Court Rule 220. 107 Ill. 2d R. 220.

Boyd Hartley was disclosed as a Rule 220 expert. However, Union Station contends that his trial testimony substantially differed on a material issue from his deposition testimony. During Hartley's deposition, he was asked his opinion as to the cause of the fire. He responded that he could not render an opinion with any degree of cer-

tainty. He stated that there were a number of possibilities with varying degrees of probability. At trial, Hartley was asked the same question and he responded affirmatively. He opined that it was a high probability that the fire started as a result of a cigarette or hot ashes in the trash carts.

We do not find the above testimonies inconsistent. The trial testimony of Hartley is a further elaboration on his deposition testimony. The same trial testimony could have been elicited at the deposition if the attorney had asked Hartley to be more specific or to list the various possibilities and their corresponding probabilities. Even assuming that the testimonies differed, we are not persuaded that Union Station was prejudiced. Accordingly, the trial court did not abuse its discretion in admitting the testimony of expert witnesses Ryan, Morton, and Hartley.

For the foregoing reasons, the order of the circuit court of Cook County is affirmed as to the imposition of liability against Union Station and reversed as to the imposition of liability against the City.

Affirmed in part; reversed in part.

JIGANTI, P.J., and McMORROW, J., concur.