**James Smith, Plaintiff-Appellee, v. 601 Liquors, Inc., a Corporation, Defendant-Appellant.**

**Gen. No. 52,153.**

First District, First Division.

October 21, 1968.

Rehearing denied November 27, 1968.

Joseph B. Lederleitner, of Chicago, for appellant.

Lawrence L. Kotin and Seymour Ogden, of Chicago (Lawrence L. Kotin and William J. Harte, of counsel), for appellee.

MR. JUSTICE MURPHY delivered the opinion of the court.

This is a personal injury action by a tavern patron against the corporate owner, for injuries alleged to have resulted from an assault by a fellow patron while plaintiff was on defendant's premises. Defendant appeals from a $20,000 verdict and judgment against it, on the theory that the verdict was against the manifest weight of the evidence, and it was error to deny defendant's motion for a directed verdict. This is not a Dramshop action.

Plaintiff testified that on April 6, 1959, at approximately 5:30 p. m., he was a customer in a tavern owned and operated by defendant at 601 East 47th Street in Chicago. Among the other customers was Sam Williams, who was also known as "Champ." Plaintiff was approached by Williams, who asked plaintiff to buy him a drink. Plaintiff told him that he didn't have enough money, and as he turned away, Williams struck him in the neck. After that he recalled only that he got up from the floor in a dazed condition and began to leave. The next thing he remembered was awakening in the Cook County Hospital.

Later plaintiff was removed to Hines Veterans Hospital, where he was questioned as to what happened to him, and he told them he had been attacked by a group of teenagers. He stated he did not tell them that he was in a bar when he was injured; he told them the first thing that came to his mind which he thought would gain him admission to the hospital.

Plaintiff knew very little about Sam Williams prior to April 6. He had seen Williams strike men in 601 on two occasions. He had spoken with Williams only once, about a coat which he had that Williams wanted. Plaintiff said that he saw nothing unusual about Williams on the evening of April 6. "He seemed to be a happy-go-lucky guy. . . . he was always laughing and joking and pushing . . . it was surprising to me when he hit me because it was no reason." When assaulted, plaintiff was 44 years

of age. At the time of the trial he walked with the aid of a crutch. His use of his hands was impaired, and his legs were numb.

Dr. James Rowe, a staff physician at Hines Hospital, testified plaintiff had been under his care from January 2, 1960, until plaintiff's discharge in November 1960. He had with him records of both Hines and Cook County Hospital, from which he testified. In his opinion plaintiff had a compression fracture of the third cervical vertebra and a spinal cord injury at the neck region. Plaintiff had a partial loss of muscular use—a paresis or incomplete paralysis. Plaintiff was hospitalized at Hines again in August and September of 1962. It was the opinion of Dr. Rowe that plaintiff's condition was related to a trauma, and the amount of recovery shown by plaintiff in November 1960 was the maximum amount that could be achieved.

Plaintiff's occurrence witnesses were Walter Collins and Charles Woods, both patrons of the tavern. Collins, who was employed as a bartender in a bar near 601 Liquors, testified that he was in 601 Liquors tavern during the assault on plaintiff. He knew both plaintiff and Williams. His employer had ordered him not to serve Williams and to keep him out of the bar if possible. Collins stated that both Williams and plaintiff had been in the bar some 45 minutes previous to the attack on plaintiff, and in that time there was no disturbance. He did not see Williams strike the plaintiff, nor did he hear any fighting prior to seeing plaintiff down. The witness joined others in keeping Williams from trampling plaintiff. The plaintiff was revived with a cold towel and undertook to leave the tavern. The witness also left 601 Liquors and crossed the street to a newsstand. As he turned to leave the newsstand he again saw plaintiff down just outside the doorway of 601 Liquors. Williams was attempting to trample plaintiff in the face when the witness knocked him aside. The plaintiff was uncon-

scious and remained that way until removed by the police.

Charles Woods stated that he knew both plaintiff and Samuel Williams before April 6, 1959. On that evening he was drinking with plaintiff at 601 Liquors. He saw Williams strike the plaintiff and knock him to the floor. Collins helped to revive plaintiff with a wet towel. When plaintiff recovered he retrieved a package from the floor and made his way toward the exit. As plaintiff reached the door, Woods saw Williams approach plaintiff from behind and strike plaintiff a blow "with all his might," which knocked plaintiff out the door and down onto the sidewalk. The witness remained nearby until the police came and took plaintiff away on a stretcher. Woods further testified that he had been hit by Williams a couple of months before. He knew Williams' reputation in the neighborhood in 1959—"Champ was just known to be bad people around. . . . Everybody was afraid of Champ."

Plaintiff's witnesses included two Chicago police officers. Officer Richard Zaremba of the Records Division of the Chicago Police Department identified three documents as police records pertaining to the "assault on April 6, 1959, involving James Smith and Samuel Williams." Officer Vernon B. Williams testified that he had been assigned to investigate the assault on James Smith by Samuel Williams on April 6, 1959. He stated that Samuel Williams, who was also known as "Champ," was an ex-boxer who had a reputation in the neighborhood for viciousness. He was sought by the police at the time of the assault on plaintiff for having knocked down a rookie policeman and taken his gun. The officer stated that a week later Williams was killed during an assault in another tavern.

Witnesses for the defense included Daniel Mashkes, who operated the tavern with his brother David. Daniel knew Williams and called him by his nickname "Champ."

310

He testified that he was working in the tavern on April 6, 1959, and nothing unusual happened between Sam Williams and the plaintiff. David Mashkes had heard of Williams' nickname "Champ" but did not personally know Williams. Leroy Foster, the bartender who was on duty at the time of the occurrence, knew both plaintiff and Williams—they called him the "Champ." He did not recall seeing Williams and plaintiff involved in any kind of an altercation in 601 Liquors on April 6, 1959. He recalled Collins did ask him "for a towel when Smitty was in trouble outside. . . . He took it and he went back out. . . . He was outside in front of the place. . . . I didn't go outside." Another bartender, Thomas Lockridge, who was not present at the time of the occurrence, had never seen Williams assault anyone in 601, and he never had trouble with Williams.

Defendant asserts that the verdict is rooted in manifestly unique improbabilities, and that the evidence is uncontradicted that there was no commotion or disturbance in 601 Liquors on April 6, 1959, for the 45-minute period after the purported assailant was said to have entered 601. Defendant argues that if the assailant were as dangerous as plaintiff has contended, defendant had no duty to warn plaintiff of a danger of which plaintiff was more cognizant than the defendant.

■ ■ We have examined the authorities cited by both sides and conclude that the rule to be applied here is that a proprietor of a tavern has a duty to exercise reasonable care to protect his patrons from annoyance or injury while they are lawfully on the premises. Also, a master is responsible for the negligent acts of his servant or agent while acting within the scope of his employment. Lipscomb v. Coppage, 44 Ill App2d 430, 197 NE2d 48 (1963).

■ ■ As to a directed verdict, the rule to be applied in Illinois is now set forth in Pedrick v. Peoria & Eastern

311

R. Co., 37 Ill2d 494, 229 NE2d 504 (1967), where it is said (p 510):

"In our judgment verdicts ought to be directed and judgments n. o. v. entered only in those cases in which all of the evidence, when viewed in its aspect most favorable to the opponent, so overwhelmingly favors movant that no contrary verdict based on that evidence could ever stand."

 As to manifest weight, in a jury trial a reviewing court will not disturb a verdict where the evidence is conflicting unless the verdict is clearly wrong, or unless the court is satisfied that the verdict is against the manifest weight of the evidence, and that an opposite conclusion is clearly evident. (Cardona v. Toczydlowski, 35 Ill App2d 11, 21, 180 NE2d 709 (1962).) "In the trial of a law suit, questions of one's due care, another party's negligence and the proximate cause of such injured party's injuries and damages are pre-eminently questions of fact for a jury's determination." Kahn v. James Burton Co., 5 Ill2d 614, 623, 126 NE2d 836 (1955).

 Initially, we find no merit in defendant's contention that "there is no evidence of causal connection between the injuries and the purported assault." The testimony of plaintiff and Dr. Rowe covers in detail plaintiff's being taken to the hospital directly from the scene of the occurrence and his subsequent hospital and medical attention.

We believe there are two determinative issues here: (1) where the assault took place, and (2) were defendant's agents informed as to the reputation and character of Williams as a dangerous and vicious man? Plaintiff and his two occurrence witnesses place the assault in the tavern; defendant's bartender and one of the owners place the assault outside of the tavern. As to Williams, the evidence of plaintiff shows that the reputation of Williams in the neighborhood was that of a dangerous

and vicious man; that he was wanted by the police for having assaulted a policeman and taken his gun; and that he had on two previous occasions assaulted patrons in defendant's tavern. Witnesses for the defendant denied knowledge of any prior assaults of patrons in the tavern by Williams. Both Daniel Mashkes and Foster knew the nickname of Williams was the "Champ," and had heard that he had assaulted a policeman. Neither of the Mashkes brothers admitted being familiar with the reputation of Williams in the neighborhood, but Lockridge, one of defendant's bartenders, stated he knew a man named "Champ," and that his reputation in the community was that of a bully, and he had heard of assaults made by him in the community, and he did come into 601 occasionally.

██ ██ After considering this record in the light of pertinent authorities, we hold that the trial court was correct in denying defendant's motion for a directed verdict, because the evidence does not "so overwhelmingly favor movant that no contrary verdict based on that evidence could ever stand." Also, we believe that it was the province of the jury to resolve the conflicts in evidence, and an opposite conclusion to the verdict of the jury is not clearly evident. There was sufficient evidence to show the assault took place in the tavern, and that the reputation of Williams, the "Champ," in that neighborhood was that of a vicious and sadistic person. There was evidence from which the jury could conclude that the defendant's agents had been negligent in their duty to exercise reasonable care to protect its patrons from annoyance or injury while they were lawfully in the premises. Plaintiff's inconsistent statements as to who assaulted him were before the jury for their consideration.

We conclude that the testimony here amply supports the verdict of the jury, who were the judges of the credibility of the witnesses, and the verdict of the jury is not against the manifest weight of the evidence.

313

■■■■■■■■

For the reasons given, the judgment for plaintiff is affirmed.

Affirmed.

BURMAN, P. J. and ADESKO, J., concur.