RICHARD A. GETSON et al., Plaintiffs-Appellees, v. EDIFICE LOUNGE, INCORPORATED, Defendant-Appellant.

Third District Nos. 3—83—0036, 3—83—0153 cons.

Opinion filed August 31, 1983.

Andrew H. Marsch, of Wheaton, and Richard J. Prendergast, of Chicago, for appellant.

E. Kent Ayers, Gerald R. Kinney, and Roger D. Rickmon, all of Murphy, Timm, Lennon, Spesia & Ayers, of Joliet (William R. Penn, of Massey, Penn & Gilbert, of counsel), for appellees.

JUSTICE HEIPLE delivered the opinion of the court:

The plaintiffs were stabbed in front of the Edifice Lounge in Joliet. They were stabbed by members of a gang called the "Outlaws." Mr. Getson was stabbed by Ronald Talmadge. Mr. Churnovic was unable to identify his attacker. The plaintiffs brought suit against both Talmadge and the Edifice Lounge. In the counts against the Edifice Lounge, the plaintiffs allege the stabbings were the proximate result of the lounge's negligent and wilful and wanton conduct of not protecting the plaintiffs from knife-carrying gang members. A jury returned a judgment for Churnovic, against the lounge, in the amount of $145,000 in compensatory damages and $25,000 in punitive damages. The jury returned a judgment for Getson, and against the lounge, in the amount of $170,000 in compensatory damages. However, the jury found Getson was 10% contributory negligent and consequently reduced his award to $153,000. The jury also awarded Getson $25,000 in punitive damages against the lounge. From Talmadge, Getson obtained a net award of $153,000 in compensatory damages. Getson was not awarded punitive damages for his claim against Talmadge. The Edifice Lounge appeals and raises seven issues as follows: (1) whether the defendant Edifice Lounge violated any duty to either plaintiff, who were both stabbed outside of the lounge; (2) whether the Edifice Lounge was guilty of wilful and wanton miscon-

duct; (3) whether an instruction as to agency was properly given; (4) whether the trial court improperly allowed testimony as to the reputation of the Outlaws Motorcycle Club; (5) whether a motion for directed verdict was improperly denied upon erroneous belief of the trial court that the Edifice Lounge personnel had a duty to keep persons with knives off its premises; (6) whether an instruction as to the violation of a Crest Hill ordinance was improperly given; (7) whether the verdicts rendered were excessive and unsupported by the evidence.

Getson testified he arrived at the Edifice Lounge at approximately 11:45 p.m. on May 15, 1980. He had already been to three other bars and had drunk between five and six drinks since 6:30 that evening. Getson went to the outside entrance of the lounge and spoke to the owner, Mr. DeAcetis, who was supervising the passage of customers into and out of the bar. The bar was very crowded, at or near its capacity of 200 persons. On this particular night, the bar was holding a "Punk Rock" night. The music was loud and the place was hot. Getson spoke with DeAcetis for about 10 minutes and then walked through the outside entrance way into a small 5 feet by 4 feet foyer, or vestibule. He walked through the foyer to the second, inner, entrance way which opened into the bar area. Getson entered the bar area, saw two friends, Robert Churnovic and another man, and spoke with them for 20 minutes. Then, Getson spoke with a young woman friend for about 15 minutes. Getson testified that while he was speaking with the young woman he saw Talmadge and another member of the Outlaw gang standing nearby in the bar. Talmadge was putting on his jacket which carried an "Outlaws" insignia. Both men were wearing a buck knife on their belt. Churnovic also testified he saw Talmadge in the bar area with another Outlaw member and both men were carrying a knife on their belt and a drink in their hand.

After speaking with the woman, Getson decided to go outside to get some fresh air. He walked through the inner doorway and into the foyer. The foyer was crowded. People were bumping into one another and moving in different directions. Some leaving the bar; others entering. As he made his way to the outside doorway, Getson bumped into Talmadge a couple of times. Just as Getson was moving to exit the outside door way, Talmadge said to Getson, "this means you too Mother F---er." Since both Getson and Talmadge were holding drinks, Getson thought Talmadge was referring to the rule that no one can leave the bar carrying a drink. Getson, apparently unintimidated by Talmadge in his classic biker attire, suggested to Talmadge that he "get f---ed." Getson walked out of the foyer and towards the parking

lot at the front of the bar. There were perhaps 20 to 30 people outside in the area of the front door. Getson turned around and saw Talmadge coming at him with a knife in hand. Talmadge was carrying a buck knife which had a blade about five inches long and several inches wide. Getson quickly took off his belt in order to defend himself. As Talmadge came at Getson, Getson continued to back away. He moved in between two cars. At the same time, another Outlaw came around behind Getson. Getson began swinging his belt at the two attackers, and continued to move away from them. The fight moved into the street. As Getson swang at the second attacker, Talmadge stabbed Getson twice, once in the side and once in the chest. Getson then fell unconscious. The entire fight, according to the testimony, took place in 30 seconds to one minute. The police were at the scene almost instantly because a squad car happened to be patrolling nearby and noticed the commotion.

When the fight first began, someone called into the bar that there was a fight outside. Several people in the bar came out into the parking lot to see the event. One of those persons was Churnovic. He tried to get as close as possible to the fight. Unfortunately, he came too close to the skirmish and was stabbed too. Churnovic testified that he was stabbed by the same Outlaw member who was standing next to Talmadge in the bar area.

A witness, Mr. Archey, testified he was outside the building when the fight took place. He was sitting near the outside entrance on a car. Archey saw Talmadge standing in the doorway of the outside entrance. Getson tried to pass by Talmadge. A few words were exchanged and both men moved outside. Apparently, Talmadge exited first because he was blocking the doorway. Getson moved away from the building and Talmadge followed him with a knife in his hand. Archey did not see Talmadge pull the knife from his belt. The above-described fight then took place. It was Archey who went to the entrance way and called into the bar that there was a fight outside.

The owner of the Edifice Lounge, Mr. DeAcetis, and Talmadge, told a slightly different story at trial. Mr. DeAcetis testified he was working at the door on May 15. At 10:30, three members of the Outlaws gang arrived with their girlfriends. One was wearing an "Outlaws" jacket and at least one was wearing a knife on his belt. The bartender and part-time manager also testified three Outlaws were in the bar and one was carrying a knife. DeAcetis asked the gang member wearing the "Outlaws" jacket to take it off. DeAcetis had a policy of not allowing customers to enter the bar wearing jackets showing gang insignia because he did not want trouble from people who desig-

nate themselves as a motorcycle gang. However, DeAcetis did not require the knife-carrying man to take off the knife because people wear knives all the time.

Shortly after the first group of Outlaws arrived, a second group rode into the front parking lot, parked their bikes, and went to a bar across the street. Talmadge was in the second group of bikers. Later in the evening, Talmadge attempted to enter the Edifice Lounge. DeAcetis refused to allow Talmadge inside because Talmadge refused to remove his jacket which carried the Outlaws' insignia. DeAcetis stated that he did not notice whether Talmadge was carrying a knife. DeAcetis also stated he heard what he thought to be the voice of Getson say "the beer cannot come outside" and then he heard someone swear. Both DeAcetis and the doorman were at the front door. DeAcetis saw Talmadge with a knife in his hand and Getson taking off his belt as he backed away from Talmadge. DeAcetis instructed the doorman to make sure no one went in or out of the bar. After another Outlaw grabbed a customer and put a knife to his neck, DeAcetis went to call the police. Just as he went to make the call, the nearby police officer arrived at the scene.

Talmadge stated he attempted to enter the Edifice Lounge only to stick his head in the bar to tell his fellow Outlaws to move their bikes so that he could leave. He admitted he was wearing a knife. He also stated DeAcetis said he could not enter the bar with his Outlaws jacket on; so he called to his friends, who were just inside the bar area, from the foyer area. Talmadge did not testify concerning his conversation with Getson or the details of the fight.

 As noted above, the jury returned verdicts in favor of the plaintiffs and against the Edifice Lounge. The first issue presented by the Edifice Lounge is whether the defendant Edifice Lounge violated any duty to either plaintiff, who were both stabbed outside of the Lounge. The existence of a duty is a question of law. The question here is does a possessor of land have a duty to protect invitees from criminal attacks by third persons? The court in *Krautstrunk v. Chicago Housing Authority* (1981), 95 Ill. App. 3d 529, 534, succinctly explained "the possessor of land has a duty to protect invitees from criminal attacks, but only when such attacks are reasonably foreseeable, and the burden of preventing such attacks can reasonably be placed on the defendant. (See *Gill v. Chicago Park District* (1980), 85 Ill. App. 3d 903, 905, 407 N.E.2d 671.)" Thus, we must find that as a matter of law there is a duty when the danger is foreseeable. Foreseeability must be determined upon the facts and circumstances of each case.

" '[I]n determining whether there was a legal duty, the occurrence involved must not have been simply foreseeable, as the plaintiff contends; it must have been reasonably foreseeable. The creation of a legal duty requires more than a mere possibility of occurrence. Negligence as defined in the Restatement (Second) of Torts (1965), section 282, is conduct which falls below the standard established for the protection of others "against unreasonable risk of harm." Harper and James, in their Law of Torts, observe: "Not what actually happened, but what the reasonable prudent person *would then have foreseen as likely to happen*, \*\*\*." (\*\*\* at 929.)' " *(Yangas v. Charlie Club, Inc.* (1983), 113 Ill. App. 3d 398, 403, citing *Cunis v. Brennan* (1974), 56 Ill. 2d 372, 375-76.)

The plaintiffs assert that the fact there were knife-carrying "Outlaws" in the bar gave the owner notice that someone was going to get hurt at the hands of those "Outlaws." In support of this proposition, the plaintiffs cite *Neering v. Illinois Central R.R. Co.* (1943), 383 Ill. 366. In *Neering*, the plaintiff was raped by a hobo, or vagrant, while waiting at the defendant's station for a train. Hoboes had gathered in the trainyard regularly for a long time. The court noted that hoboes are "offenders of good order" and found "that where law breakers congregate they are dangerous to society and are likely to break other laws." Apparently, plaintiffs would like this court to hold, as a matter of law, that wherever "Outlaws" go trouble follows.

The case at hand does not fit within *Neering* for two reasons. One, a hobo, or vagrant, is a status which can be specifically characterized as illegal by statute. (See Ill. Rev. Stat. 1981, ch. 24, par. 11—5—4.) While motorcycle gangs may be undesirable, they are not illegal. Two, in *Neering*, the plaintiff, on several occasions prior to the crime, notified the ticket agent of the defendant of her fear of the hoboes. In the case at hand, there is no evidence DeAcetis or his agents had ever seen Talmadge or the gang members cause trouble prior to the night of the fight. And, there was no evidence DeAcetis or his agents knew, prior to the night of the fight, that Talmadge was a troublemaker. We cannot say as a matter of law that someone who is a member of a motorcycle group and who happens to carry a buck knife is *per se* dangerous. There must be evidence of actions of Talmadge of which DeAcetis was aware, or should have been aware, which would have compelled a reasonably prudent person to conclude that it was likely Talmadge might endanger an invitee.

The issue of foreseeability and notice in the instant case is much like the foreseeability issue in *Yangas v. Charlie Club, Inc.*

(1983), 113 Ill. App. 3d 398, wherein this court observed that the club was not made aware of any violent or dangerous conduct of the attacker, and while on the club premises the attacker caused no problem (until the attack). In the instant case, there was simply no evidence prior to the attack that would have put DeAcetis on notice that Talmadge was likely to cause harm and injury.

Once the fight began, of course, DeAcetis was made aware that Talmadge was dangerous. DeAcetis had a duty to act to protect his invitees. The question then is did he act reasonably once the fight began? It must be remembered that the fight transpired in less than one minute (by some accounts the fight lasted between 30 and 45 seconds). Upon seeing the altercation, DeAcetis instructed the doorman not to let anyone in or out of the bar. And, after an "Outlaw" grabbed another customer and put a knife to his throat, DeAcetis went to call the police. Fortunately, the police were on the scene almost immediately—even before DeAcetis was able to call them. Yet, even with the almost instantaneous appearance of the police, the stabbing of Getson and Churnovic could not be prevented. We believe that DeAcetis acted reasonably under the circumstances and, thus, was not negligent.

■ In sum, we hold that DeAcetis had no duty to keep persons off of his premises where there was no indication that such persons were likely to endanger an invitee. Moreover, we find no causal connection between DeAcetis' conduct in admitting persons to his premises and the stabbing which later occurred in the parking lot. Finally, we find that once the fight began, DeAcetis acted reasonably in discharge of his duty to protect his customers by acting expeditiously to bar ingress and egress and to call the police. The fight erupted and ended before he could do anything more. Having found that DeAcetis was not negligent, we also find he was not guilty of wilful and wanton conduct. We reverse the verdict of the jury and the judgment entered by the court on all counts. Having reversed the case for the foregoing reasons, we need not consider the other issues on appeal.

Reversed.

STOUDER, P.J., and ALLOY, J., concur.