DREW LUCHT, Plaintiff-Appellee, v. STAGE 2, INC., Defendant-Appellant and Counterplaintiff-Appellant (Mark Rupnik *et al.*, Counterdefendants-Appellees).

Fourth District   No. 4—92—0034

Opinion filed December 30, 1992.

680

Sorling, Northrup, Hanna, Cullen & Cochran, Ltd., of Springfield (David A. Rolf and Patrick V. Reilly, of counsel), for appellant.

Delano Law Offices, P.C., of Springfield (Charles H. Delano III and Charles H. Delano IV, of counsel), for appellees.

JUSTICE COOK delivered the opinion of the court:

Plaintiff, Drew Lucht, sued defendant, Stage 2, Inc., a dance club, to recover damages resulting from a battery that occurred at Stage 2 on January 6, 1989. Stage 2 filed a counterclaim against Mark Rupnik and William Hoskins, alleging that they were responsible for plaintiff's injuries. The jury returned a verdict in favor of plaintiff and against Stage 2, Rupnik, and Hoskins, awarding plaintiff a total of $211,700. The trial court entered judgment on the verdict, and a judgment on the counterclaim in favor of Stage 2 and against Rupnik in the amount of $21,170, and in favor of Stage 2 and against Hoskins in the amount of $105,850. Stage 2 appeals, arguing that (1) it did not owe plaintiff a duty to protect him from the criminal act of a third party; (2) the trial court committed reversible error by allowing plaintiff's expert to testify in violation of Supreme Court Rule 220 (134 Ill. 2d R. 220); (3) the trial court erred by allowing some of plaintiff's exhibits into evidence; and (4) the evidence does not support the jury's verdict.

We affirm.

I. FACTS

On January 6, 1989, plaintiff and two friends went to Stage 2, a teenage dance club for persons 14 to 20 years in age in Springfield, Illinois. While at the club, Kim Bernard, plaintiff's niece, argued with Mark Rupnik. Plaintiff stepped in and told Rupnik to leave his niece alone. Pierre Parrish, a Stage 2 security guard, saw this inci-

dent and broke up the confrontation. Although William Hoskins was not involved in the argument, he was standing with his friend Rupnik.

Approximately 10 minutes later, Rupnik, Hoskins, and one other person approached plaintiff and his two friends at the soda bar. Rupnik spoke to plaintiff, who told Rupnik he had no problem with him. No one was pushing, shoving, or using hostile words. However, as Rupnik walked away, he looked over his shoulder and nodded his head, apparently in the direction of Hoskins. Suddenly, Hoskins stepped toward plaintiff, told plaintiff to quit staring at him, and then punched plaintiff in the mouth. Before plaintiff or his friends could react, Hoskins hit plaintiff a second time.

Plaintiff testified that he suffered severe headaches for several days after the beating, although medication helped ease the pain. He was also bedridden for several days, could not walk without help, and did not recognize friends who would visit him. After being hospitalized for 10 days, he still experienced extreme pain in his head and weakness due to a brain hemorrhage. Light irritated his condition, so the drapes were shut and lights kept off in his room for a month. Plaintiff testified at trial that he still suffered from weakness, fatigue, recurrent incapacitating headaches, memory loss, and mental sluggishness.

At trial, plaintiff introduced evidence concerning security that Stage 2 had implemented since it opened in May 1988. Robert Scheer, owner of Stage 2, hired a manager and a security staff for Stage 2. The manager, David Whitman, supervised the security staff. Scheer also hired plainclothes, off-duty Springfield police officers to work at the club for security. Security officers at Stage 2 were supposed to watch for arguments, be ready to break up fights, and watch people who had been in arguments. Stage 2 also kept file cards for future reference on individuals who were involved in incidents at the club.

Several members of Stage 2's security force testified at trial. Garrick Williams, one of those security officers, testified that his job at Stage 2 was to break up fights and watch for alcohol and arguments. He estimated that at least one argument and one "pushing fight" occurred weekly at the club, although "knock-down, drag-out fights" did not occur very often. Club policy required the security guards to watch people who had argued earlier in the night as long as they remained at the club.

Stage 2 management had specifically told Williams to keep an eye on Rupnik, whom they deemed "a known troublemaker." Stage

2 security guards knew of Rupnik's reputation as someone who would usually instigate some confrontation but then have someone else do his fighting for him. Williams also knew of Hoskins' reputation as a "hothead." Another security guard, Jacqueline Ryan, corroborated Williams' testimony about Rupnik's reputation. David Whitman, manager of Stage 2, was responsible for security at the club and imposed penalties on patrons who violated club rules. Whitman testified that prior to the incident in question, Rupnik had been banned from the club for two weeks for slamming his fist or a pool stick through the wall of the pool room after missing a shot during a game of pool.

Security guard Parrish testified that Stage 2 had six security stations throughout its premises to be staffed by one security guard each. Five of these stations were at fixed points throughout Stage 2. A sixth security officer was supposed to roam the premises. Parrish became familiar with Rupnik shortly after starting employment at Stage 2 and knew of Rupnik's reputation as a troublemaker. Parrish said that Rupnik and his friends would occasionally bully other patrons at the club, and that on several other occasions Rupnik threatened to fight patrons at the club if they did not give him money. Parrish testified that on the evening in question but before Hoskins hit plaintiff, some Stage 2 patrons advised Parrish that there was going to be a fight that night that might involve Rupnik.

The jury found in favor of plaintiff and awarded the following damages: compensatory damages, $10,500; future pain and suffering, $200,000; disability, $0; and lost wages, $1,200; for a total of $211,700. The jury assessed negligence in the following manner: plaintiff, 1%; Stage 2, 39%; Rupnik, 10%; and Hoskins, 50%.

## II. ANALYSIS

### A. *Negligence*

"To properly state a cause of action for negligence, the plaintiff must establish that the defendant owed a duty of care, a breach of that duty, and an injury proximately caused by the breach." (*Wojdyla v. City of Park Ridge* (1992), 148 Ill. 2d 417, 421, 592 N.E.2d 1098, 1100; see also *Rowe v. State Bank* (1988), 125 Ill. 2d 203, 215, 531 N.E.2d 1358, 1364.) Duty is determined by asking whether plaintiff and defendant stood in a relationship to one another such that the law imposed upon the defendant an obligation of reason-

able conduct for plaintiff's benefit. (*Ward v. K mart Corp.* (1990), 136 Ill. 2d 132, 140, 554 N.E.2d 223, 226.) Whether there is a relationship between the parties so as to impose a legal obligation upon one for the benefit of another is a question of law to be determined by the court under the facts of each particular case. *Rowe*, 125 Ill. 2d at 215, 531 N.E.2d at 1364.

## 1. Duty

■ Illinois recognizes a duty between business invitees and their hosts. (See *Rowe*, 125 Ill. 2d at 216, 531 N.E.2d at 1364.) A relationship between the parties is that of business invitee and invitor when the following circumstances exist:

"A person is a business invitee on the premises of another if (1) he enters by express or implied invitation, (2) his entry is connected with the possessor's business or with an activity the possessor conducts or permits to be conducted on his premises, and (3) there is a mutuality of benefit or an advantage to the possessor." (*Longnecker v. Illinois Power Co.* (1978), 64 Ill. App. 3d 634, 638-39, 381 N.E.2d 709, 713.)

(See also Ill. Rev. Stat. 1989, ch. 80, par. 302 (abolishing the common law distinction between invitees and licensees, but retaining the law as to trespassers).) The facts in the present case clearly establish that plaintiff was a business invitee of Stage 2, and a duty therefore existed between them because of this relationship.

■ Section 344 of the Restatement (Second) of Torts sets forth the obligations of a business invitor for the conduct of third persons as follows:

"A possessor of land who holds it open to the public for entry for his business purposes is subject to liability to members of the public while they are upon the land for such a purpose, for physical harm caused by the accidental, negligent, or intentionally harmful acts of third persons or animals, and by the failure of the possessor to exercise reasonable care to

(a) discover that such acts are being done or are likely to be done, or

(b) give a warning adequate to enable the visitors to avoid the harm, or otherwise to protect them against it." Restatement (Second) of Torts §344, at 223-24 (1965).

This duty of business invitors in Illinois toward their customers is the following: "[A]n owner or occupier of land in Illinois owes a

duty to invitees *on* his premises to reasonably guard against acts of third parties when such attacks are reasonably foreseeable." (Emphasis in original.) (*Rodgers v. Hook-Super X, Inc.* (1990), 204 Ill. App. 3d 861, 863, 562 N.E.2d 358, 359.) In addition, the Illinois Supreme Court has written that when considering whether a duty exists in any negligence action, "a court must weigh the foreseeability that defendant's conduct will result in injury to another and the likelihood of an injury occurring, against the burden to defendant of imposing a duty, and the consequences of imposing this burden." (*Ziemba v. Mierzwa* (1991), 142 Ill. 2d 42, 47, 566 N.E.2d 1365, 1366-67; see also *Diebert v. Bauer Brothers Construction Co.* (1990), 141 Ill. 2d 430, 438, 566 N.E.2d 239, 243.) In this case, the parties have focused primarily on the issue of foreseeability in their arguments about whether Stage 2 owed a duty to plaintiff. Accordingly, we must address foreseeability.

## 2. Foreseeability

■ Even if a defendant acts negligently, liability does not automatically attach if an independent, intervening, illegal act of a third person causes plaintiff's injury. (*Rowe*, 125 Ill. 2d at 224, 531 N.E.2d at 1368, citing W. Keeton, Prosser & Keeton on Torts §33, at 201 (5th ed. 1984).) Criminal acts may be a superseding cause of injury relieving the original negligent party of liability. However, an exception to this rule exists where defendant's acts or omissions create conditions conducive to foreseeable, intervening criminal acts. (*Rowe*, 125 Ill. 2d at 224, 531 N.E.2d at 1368.) If the criminal act is reasonably foreseeable at the time of the negligence, the causal chain is not necessarily broken by the intervention of such an act. (*Rowe*, 125 Ill. 2d at 224, 531 N.E.2d at 1368.) Thus, the issue before this court is whether the Stage 2 security team could reasonably foresee Hoskins' assault on plaintiff. We hold that it could.

In *Smith v. 601 Liquors, Inc.* (1968), 101 Ill. App. 2d 306, 308, 243 N.E.2d 367, 368, a patron sued the corporate owner of a tavern after he was assaulted by a fellow patron, Sam "Champ" Williams, within defendant's premises. A witness testified that Williams was known by persons at the bar as " 'bad people.' " (*Smith,* 101 Ill. App. 2d at 310, 243 N.E.2d at 369.) A police officer testified that Williams had a reputation in the neighborhood as a vicious man. In fact, the officer testified that "Champ" had been killed in another tavern brawl a week after he assaulted Smith. (*Smith,* 101

Ill. App. 2d at 310, 243 N.E.2d at 369.) However, the bar owners testified that they did not know Williams' reputation and stated they saw no confrontation between Williams and the plaintiff before Williams attacked the plaintiff. (*Smith*, 101 Ill. App. 2d at 310-11, 243 N.E.2d at 369.) The appellate court ruled that the proprietor of a tavern has an affirmative duty to exercise reasonable care to protect his patrons from annoyance or injury while the patrons are lawfully on the premises. (*Smith*, 101 Ill. App. 2d at 311, 243 N.E.2d at 370.) The court stated that because Williams had a reputation for abusive behavior and had come into defendant's tavern occasionally, a jury could fairly and properly conclude that defendant's agents had been negligent in their duty to exercise reasonable care to protect patrons from annoyance or injury when the patrons were lawfully in the tavern. *Smith*, 101 Ill. App. 2d at 312-13, 243 N.E.2d at 370; see also *Lessner v. Hurtt* (1977), 55 Ill. App. 3d 195, 197, 371 N.E.2d 125, 126.

In *Hayes v. O'Donnell* (1979), 76 Ill. App. 3d 695, 395 N.E.2d 184, plaintiff filed suit against the owners of a tavern in which he was assaulted. In addressing the negligence counts of plaintiff's complaint, the court applied section 314A of the Restatement (Second) of Torts (Restatement (Second) of Torts §314A (1965)) and stated the following:

"While section 314A does not make a tavern keeper an insurer of his patron's safety, it does impose an obligation to take reasonable affirmative action to protect against the misconduct of third parties, and to give aid in circumstances when a member of the general public would have no duty to do so. ***

*** A tavern keeper's duty to his patrons does not arise until the danger is apparent or the circumstances are such as to put a prudent person on notice of the probability of danger." (*Hayes*, 76 Ill. App. 3d at 697, 395 N.E.2d at 185-86.)

Because the plaintiff in *Hayes* sufficiently alleged that the defendants knew of the assailant's violent and dangerous nature, the appellate court reversed the trial court's granting of a motion to dismiss. *Hayes*, 76 Ill. App. 3d at 698, 395 N.E.2d at 186.

Finally, in *Rowe*, plaintiffs sued the owner, operator, and developer of an office park. Rowe alleged that she suffered personal injuries when a former employee of the developer entered the office using a master key negligently entrusted to him and assaulted Rowe. (*Rowe*, 125 Ill. 2d at 207-08, 531 N.E.2d at 1360.) The supreme court held that a landlord may be held liable for harm to a

tenant, or those on the premises with the tenant's consent, if its negligence facilitates the criminal acts of a third person and the criminal activity is reasonably foreseeable. (*Rowe*, 125 Ill. 2d at 224, 531 N.E.2d at 1368.) Because the landlord's failure to take precautions to guard against unauthorized entries by those with a master key facilitated the former employee's entry, the court held that it was reasonably foreseeable that the owner and operator of the office park should be held liable for damages proximately caused by the crimes. *Rowe*, 125 Ill. 2d at 225, 531 N.E.2d at 1369.

■ Given the specific facts in the case before us, we conclude that Stage 2 could reasonably foresee the harm caused to plaintiff. The unrebutted testimony from Stage 2's own security guards was that Rupnik was a known troublemaker who would start fights and then use other people to fight his battles for him. These guards knew of the confrontation between Lucht and Rupnik, and one guard was even told that Rupnik was going to start a fight sometime that evening. While there is no duty on proprietors to take affirmative action to protect their patrons from third parties absent evidence that the attack was foreseeable (see *Getson v. Edifice Lounge, Inc.* (1983), 117 Ill. App. 3d 707, 713, 453 N.E.2d 131, 135; *Yangas v. Charlie Club, Inc.* (1983), 113 Ill. App. 3d 398, 402, 447 N.E.2d 484, 487-88), in this case Stage 2 personnel knew of both Rupnik's reputation and his *modus operandi* of using others to fight his battles. Thus, while we reaffirm that proprietors are not and cannot be *insurers* of the safety of their patrons, on these facts Stage 2 could foresee the injuries plaintiff suffered at the hand of Rupnik's apparent confederate and stooge, Hoskins. Therefore, we must affirm the trial court's finding here of a duty. Having found that a common law duty existed between plaintiff and Stage 2, we need not address plaintiff's other claims for finding a duty.

## B. *Supreme Court Rule 220*

Defendant argues that the trial court committed reversible error in allowing plaintiff's expert, David Schachtsiek, to state his opinion as to causation because that opinion violated Supreme Court Rule 220 (134 Ill. 2d R. 220).

In the present case, defense counsel asked plaintiff's counsel in pretrial interrogatories to "[s]tate each and every opinion and a conclusion upon which the expert may be requested to testify, and the basis therefor." Plaintiff responded that he did "not [at that time] possess such information." After further correspondence be-

tween counsel and requests for this information, plaintiff responded that his expert had "not rendered such opinion at this time." Defendant filed a motion to compel discovery and for sanctions. Finally, plaintiff filed an amended supplemental interrogatory answer, which included the following about his expert's opinions:

> "Mr. Schachtsiek has given the oral opinions that the Defendant, Stage 2, Inc.[,] *fails to meet national standards* [(emphasis added)] in the following areas: the hiring and selection process for security at Stage Two, Inc.; training standards for security at Stage Two, Inc.; performance and evaluation of security employees at Stage Two, Inc.; in guidance and supervision of security employees at Stage Two, Inc.; that the program existing at Stage Two, Inc.[,] for security employees was inadequate to the environment and that Stage Two, Inc.[,] used off-duty police officers as security for their establishment.

> \* \* \*

> Mr. Schachtsiek has given his oral opinion to Plaintiff's Counsel that the Defendant, Stage Two, Inc.[,] fails to meet security standards as set forth in the National Advisory Committee on Criminal Justice Standards and Goals *Report of the Task Force on Private Security*[ ] (Washington, D.C.: U.S. Government Printing Office, 1976)[,] and *The Hallcrest Report: Private Security and Police in America* by William C. Cunningham and Todd M. Taylor (Chancellor Press, Portland OR, 1985).

> The specific areas of security practice which the Defendant violates are in the improper hiring and selection process for security at Stage Two[,] Inc.[,] in Springfield; the improper training standards for security at Stage Two[,] Inc.[,] in Springfield; the improper performance evaluation of security employees of Stage Two[,] Inc.[,] in Springfield, the improper guidance and supervision of security employees at Stage Two [,] Inc.[,] in Springfield; that the security program existing at Stage Two[,] Inc.[,] in Springfield was inadequate for the environment and in that Stage Two[,] Inc.[,] in Springfield improperly used off-duty officers as security for their establishment." (Emphasis in original unless otherwise noted.)

In his discovery deposition, Schachtsiek provided the following testimony:

> "Q. [Defense attorney]: [W]hat are your opinions, now, in regard to the security at Stage 2, specifically?

A. They have a terribly deficient security program and, by definition, do not, in fact, have a program.

\* \* \*

Q. Do you have any other opinions which you render—have rendered to plaintiff's counsel or have formed in this case that we have not discussed today?

A. Nothing comes to mind, no."

Then, in his videotaped evidence deposition, held nine months after his discovery deposition, the following exchange occurred between Schachtsiek and the attorneys:

"Q. [Plaintiff's attorney:] Now, do you have an opinion based on a reasonable degree of security certainty as to whether Stage 2 on January 6, 1989, was following generally accepted security principles in operating their security program?

A. I do, yes.

Q. And what is that opinion?

A. That they most definitely had no security program and what they didn't [sic] have was quite ineffectual.

Q. *Do you have an opinion based on a reasonable degree of security certainty as to whether the failure to follow security standards by Stage 2 on January 6, 1989, caused or contributed to the injury of Drew Lucht?*

[Defense attorney]: I'm going to object to the question and state that there's been no opinions of Mr. Schatchseik [sic] expressed as to causation throughout this procedure \* \* \*, or the depositions, or at any other time due to the fact that [Supreme Court Rule] 220 puts a continuing burden on updating opinions on the party and it's never—Mr. Schatchseik [sic] has never, to date, rendered an opinion as to causation. I would object to the question.

[Plaintiff's attorney]: We note your objection.

Q. Do you have such an opinion?

A. I do, yes.

Q. And what is that opinion, sir?

A. Initially that they did not have an access control program or an access control component to their security program, certainly not one that was systematically applied at Stage 2 in Springfield.

If that access control process had been operating satisfactorily, that alone may have kept Rupnik out of the premises. Once he got inside, the security program broke down and al-

lowed him to remain inside. Thirdly, station five, that securiting [*sic*] location in proximity to the incident[,] was not staffed at that time and that also added to the cause for the incident occurring.

[Defense attorney]: I move to strike his answer to that question.

[Plaintiff's attorney]: We noted that.

Q. And *in what respect \*\*\* did the failure to station*, station number five that has been identified by Stage 2, *cause or contribute to this matter*?

[Defense attorney]: I'm going to object to the lack of foundation as to that station five was not staffed.

[Plaintiff's attorney]: We note your objection and I will assure you that the testimony has been it was unstaffed that night. And as you well know, counsel.

Q. Go ahead, sir.

A. If properly trained security personnel had been at that particular station, they would have been able to promptly initiate some type of pro-active response, some type of intervention to stop the altercation before it got to the point of injuries resulting." (Emphasis added.)

At trial, the court and counsel discussed the admissibility of this testimony, and the trial court ruled as follows:

"THE COURT: Okay. Rule 220 is to prevent surprise so that you can prepare your case, but—

[Defense attorney]: This is obviously a surprise.

THE COURT: Well, if he had come in and testified that—I can't even come up with a good example of something that might be a surprise, but having an expert who testifies as to standards, the conflict of causation is the consent of—is implicit in that type of testimony. I can't believe that after he tells you that's wrong—how could you have been surprised that he then reached that opinion? You could have been surprised if he'd said that, you know, there were nuclear weapons in the back room and he hadn't previously disclosed it, but I mean, that's the whole purpose of experts in all of these cases, and I fully acknowledge that causation and breach of standard of care are two separate issues that have to be proved, but hiring an expert who talks about breaches of standards to me is just implicit that causation was a part of the subject matter that he will be covering.

\* \* \*

\*\*\* Reviewing the totality of the deposition, I—I cannot agree with you, so Lines 14 through 24 on Page 31 [(defendant's objection)] are deleted."

■■ Even if the opponent takes no discovery, Supreme Court Rule 220 requires a party to disclose the identity of any expert "retained to render an opinion at trial." (134 Ill. 2d R. 220(b)(1).) With only a minimum of discovery the opponent may then obtain basic information regarding the expert's testimony: if the opponent files Rule 220 interrogatories, the party retaining the expert must disclose the expert's subject matter, conclusions, opinions, bases therefor and qualifications. The information produced in response to a Rule 220 interrogatory is "basic," however, and depositions or other discovery may be necessary "as a means of obtaining a full appreciation of an expert's views." 134 Ill. 2d R. 220(c), Committee Comments, at 182; *cf. Marshall v. Osborn* (1991), 213 Ill. App. 3d 134, 145, 571 N.E.2d 492, 500 (not an abuse of discretion to bar trial testimony that speed was between 40 and 45 miles per hour where answer to interrogatory was that expert would testify defendant "was traveling at a much greater rate of speed than 10 to 15 miles per hour"; no deposition was taken).

"To the extent that the facts known or opinions held by an expert have been developed in discovery proceedings through interrogatories, depositions or requests to produce, his direct testimony at trial may not be inconsistent with or go beyond the fair scope of the facts known or opinions disclosed in such discovery proceedings. However, he shall not be prevented from testifying as to facts or opinions on matters regarding which inquiry was not made in the discovery proceedings." 134 Ill. 2d R. 220(d).

■■ There is a difference between applying Rule 220(d) to Rule 220 interrogatories and to depositions. Where basic discovery is sought by Rule 220(c) interrogatory, a general interrogatory is sufficient, and it cannot be asserted that a sufficiently specific "inquiry" was not made as to those basic matters. Only where the opponent filed no interrogatory at all could it be said no inquiry was made. (See *Marshall v. Taylor-Wharton Co.* (1992), 234 Ill. App. 3d 596, 613, 599 N.E.2d 1015, 1025 ("inquiry" language of Rule 220(d) should have only limited application in light of the requirement that a party continuously supplement answers to interrogatories).) Once a Rule 220 interrogatory is filed, as was done in this case, the party retaining the expert has the affirmative duty to disclose the

expert's opinions and the bases therefor, and to then supplement those answers as additional information becomes known. The opponent can only be faulted for failure to inquire for information beyond that basic information. In *Fogarty v. Parichy Roofing Co.* (1988), 175 Ill. App. 3d 530, 541, 529 N.E.2d 1055, 1063, an expert was allowed to testify to additional opinions where plaintiff's attorney did not ask for any additional opinions at the deposition, but in that case Rule 220 interrogatories were not filed.

■ Subsequent discovery can limit or eliminate opinions disclosed in answer to a Rule 220 interrogatory. (*Mid-America Bank & Trust Co. v. Commercial Union Insurance Co.* (1992), 224 Ill. App. 3d 1083, 1088, 587 N.E.2d 81, 84.) Likewise, answers to interrogatories can be expanded or supplemented by amending those answers as additional information, including opinions, becomes known. (134 Ill. 2d R. 220(c)(3); *cf. Singh v. Air Illinois, Inc.* (1988), 165 Ill. App. 3d 923, 520 N.E.2d 852 (expert allowed to update answers using previously disclosed methodology and tables without supplementing answers to interrogatories).) An opponent's failure to inquire at deposition does not affect the affirmative duty of the party retaining the expert to respond to and supplement Rule 220 interrogatories. (See *Huelsmann v. Berkowitz* (1991), 210 Ill. App. 3d 806, 809, 568 N.E.2d 1373, 1376 (abbreviated answer to Rule 220 interrogatory insufficient even if expert were later deposed).) Rule 220 recognizes that a party retaining an expert (and the expert as well), acting in good faith, may know more at the end of discovery than at the beginning. The solution is to require disclosure as soon as additional information is known, not to require that answers to interrogatories be loaded up with every conceivable bit of information or conjecture.

■ An expert is not limited to the exact words used in discovery, whether interrogatories or deposition, but to the "fair scope" of the opinions disclosed. (134 Ill. 2d R. 220(d).) The answers to Rule 220 interrogatories in this case indicate that Stage 2 at its Springfield location fails to meet various national standards, has an improper hiring and selection process, uses improper training standards for security, improperly evaluates security employees, improperly guides and supervises security employees, and its existing security program was inadequate. The expert here was not engaged in an abstract inquiry, but in an investigation of security practices as they applied to this particular case. The question on causation asked in the videotaped evidence deposition was within the fair scope of the answers to Rule 220 interrogatories. Those answers were basic,

and were not required to contain every question and answer plaintiff would later ask at trial. Plaintiff was not required to depose his own witness. Defendant could have obtained a fuller appreciation of the expert's views with specific questions at the deposition, but chose not to.

In *Crawford County State Bank v. Grady* (1987), 161 Ill. App. 3d 332, 335-39, 514 N.E.2d 532, 535-37, the expert was allowed to go beyond the scope of his deposition testimony because specific questions were not asked at the deposition. (See also *Swaw v. Klompien* (1988), 168 Ill. App. 3d 705, 715, 522 N.E.2d 1267, 1274 (opinion regarding extent and permanency of injury "simply was not developed" during deposition).) In *McGuckin v. Chicago Union Station* (1989), 191 Ill. App. 3d 982, 1000-01, 548 N.E.2d 461, 473-74, an expert was asked at deposition his opinion as to the cause of a fire. He responded he could not render an opinion with any degree of certainty, that there were a number of possibilities with varying degrees of probability. The opponent did not ask the expert to be more specific or to list the possibilities and probabilities. The testimony was admitted at trial on the basis it was not inconsistent with other deposition testimony, but was a further elaboration on deposition testimony which the opponent could have gone into at the deposition. *Cf. Bart v. Union Oil Co.* (1989), 185 Ill. App. 3d 64, 540 N.E.2d 770 (seemingly vague testimony at trial exceeded the scope of seemingly vague testimony at the deposition).

■ In determining whether there has been a Rule 220 violation, a court must consider whether the opponent has been surprised, whether the disclosure has been timely, and whether there has been good faith. (*Barth v. Reagan* (1990), 139 Ill. 2d 399, 418-19, 564 N.E.2d 1196, 1205.) As the trial judge said in this case, "I can't believe that after he tells you that's wrong—how could you then have been surprised [that he had an opinion on causation]." An opponent cannot close its eyes to the clear import of what is said in answer to Rule 220 interrogatories. The answers to the Rule 220 interrogatories here, read to the extent of their fair scope, included the opinion on causation given at trial. The catchall question asked at deposition, "do you have any other opinions," sought the same general information as did the Rule 220 interrogatories. Just as the answers to interrogatories were sufficient, the answer to the deposition question was sufficient. Defendant had to inquire into that. The trial court saw no indication of bad faith, nor do we. The trial court properly allowed all of Schachtsiek's causation testimony.

## C. *Admission of Exhibit Nos. 2 and 3*

■■■ Exhibit Nos. 2 and 3 are file cards kept by Stage 2 that refer to Rupnik's reputation as an alleged drug dealer and his overall poor reputation. Stage 2 compiled these records *after* the incident in question with plaintiff, but plaintiff offered them to show Stage 2's preexisting knowledge of Rupnik's reputation as a troublemaker. While plaintiff alleges that these exhibits are relevant, relevant evidence may be excluded if its admission would cause unfair prejudice, confusion of the issue, undue delay, and the needless presentation of cumulative evidence, or would mislead the jury. (See M. Graham, Cleary & Graham's Handbook of Illinois Evidence §403.1, at 167-68 (5th ed. 1990).) The determination of what is relevant is largely within the discretion of the trial court, and reversal is not warranted absent an abuse of that discretion. (*Carlyle v. Jaskiewicz* (1984), 124 Ill. App. 3d 487, 496, 464 N.E.2d 751, 758.) The party asserting error in the admission of exhibits must show that it was prejudiced by admission of these exhibits. (*Kyowski v. Burns* (1979), 70 Ill. App. 3d 1009, 388 N.E.2d 770.) Reviewing these exhibits and their use in this trial, we find no abuse of discretion in that any prejudicial effect of these exhibits is outweighed by their probative value.

## D. *Jury's Verdict*

■■■ Last, defendant argues that the jury's verdict is inconsistent and against the manifest weight of the evidence. Defendant raises this argument in a somewhat unique way, arguing that the jury verdict was inconsistent because it awarded plaintiff damages for future pain and suffering while awarding nothing for disability. However, *plaintiff* is not challenging the sufficiency of damages the jury awarded; instead, defendant Stage 2 is doing so as a sort of general attack on the ability of this jury to do its job. We are unimpressed by defendant's argument and will evaluate the jury's verdict to determine whether it bears a reasonable relationship to the loss plaintiff suffered.

A jury's finding on damages should not be disturbed unless damages are manifestly inadequate, a proven element of damages is ignored, or the amount awarded bears no reasonable relationship to the loss suffered. (*Martin v. Cain* (1991), 219 Ill. App. 3d 110, 114-15, 578 N.E.2d 1161, 1164.) At trial, plaintiff testified that he was 22 years old, and the court took judicial notice that he had a life

expectancy of 51.4 years (according to the Statistical Abstract of the United States Department of Commerce). Plaintiff testified that he was a high school graduate but did not complete college because of financial difficulties. Plaintiff held various jobs, including pharmacy technician, rehabilitation aid, and janitor. At the time of his accident, he received $4.50 per hour for his work as an aid, and $5 per hour as a janitor. He testified that he can no longer exercise or play sports as he did prior to the accident.

In *Rainey v. City of Salem* (1991), 209 Ill. App. 3d 898, 568 N.E.2d 463, the defendant argued that the plaintiff's damages were not proved by sufficient evidence. In affirming the judgment for plaintiff, the appellate court stated as follows:

"If the elements of damage presented for the jury's consideration are proper under the facts of the case, then the assessment of damages is preeminently for the jury, even though reasonable persons could differ as to the amount." *Rainey*, 209 Ill. App. 3d at 907, 568 N.E.2d at 469.

On this record, we cannot conclude that the jury's award of damages bears no reasonable relationship to the loss suffered.

### III. CONCLUSION

For the reasons stated, we affirm the judgment of the circuit court.

Affirmed.

McCULLOUGH, J., concurs.

PRESIDING JUSTICE STEIGMANN, dissenting:

I respectfully dissent from the portion of the majority opinion which holds that no Rule 220 violation occurred in this case. In my judgment, plaintiff's conduct clearly violated that rule, and reversal is required.

Schachtsiek's discovery deposition disclosed his opinions on *the standard of security* provided at Stage 2. Then later, in his evidence deposition, plaintiff's counsel asked for his opinion on *causation*. A distinct, obvious, and appreciable difference exists between breaching standards and whether that breach caused the plaintiff's injuries. (See W. Keeton, Prosser & Keeton on Torts §42, at 275 (5th ed. 1984) (confusing standards of conduct with causation "obscure the real issue, *** suggest artificial distinctions of causation

which have no sound basis, and can only arise to plague [the confused party] in the future"); see also *Hansel & Gretel Day Care Center v. Industrial Comm'n* (1991), 215 Ill. App. 3d 284, 294, 574 N.E.2d 1244, 1251 (denying workers' compensation recovery where plaintiff failed to prove causation connected with employment).) Despite the close relation between the issues of breach of standards and causation, they remain separate and distinct.

Given the burden imposed by Rule 220, and that rule's obvious intention of reducing the gamesmanship of pretrial preparation and subsequent surprise at trial, such as occurred in this case, attorneys should *always* err on the side of disclosing *too much* of the specific subject matter about which they expect their expert to testify or risk the consequence that some or all of the expert's testimony will be barred by the trial court or will provide the basis for reversal by a court of review.

The majority opinion seems to assume that causation *must* necessarily follow from Schachtsiek's statement that security at Stage 2 was deficient. That position is not correct, either logically or legally. Indeed, if the majority opinion were correct on this point, then the black-letter law's notion of what constitutes a tort—(1) the existence of a duty, (2) its breach (namely, the performance of some negligent act, such as having deficient security), and (3) proximate cause of the plaintiff's injury due to that breach—would be stood on its head. The majority opinion's assumption that causation must follow from a finding of negligence effectively eliminates the third element—causation.

I readily concede that in many cases, no question will arise that plaintiff's injuries were proximately caused by defendant's negligent conduct. However, that fact gives no solace to the majority's position here. Rule 220(d) was designed to cut out the game-playing, the uncertainties, and the just plain sleazy tactics too often used by litigants to hide the testimony of their experts from the other side and to surprise them with that testimony at trial, just like what happened in the present case. By promulgating Rule 220(d), the supreme court intended to put a stop to it; by affirming the trial judge's finding of no error in this case, we fail in our duty to follow the supreme court's mandate.

I also strongly disagree with the majority opinion's assessment that there was anything the matter with the general type of catch-all question asked by defendant. Surely, given the ever-increasing costs of litigation and discovery, counsel representing the party opposing the expert witness ought not bear the burden to ask every

conceivable question about any *specific* possible opinion pertaining to that case that the expert might hold. If we are to hold that opposing counsel's failure to do so results in the loss of any protections provided under Rule 220(d), then truly we have reached the point of "practicing of law by word processors and copy machines," a complaint I already hear with increasing frequency from practitioners.

Rule 220 places an *ongoing* burden on an attorney who intends to offer the testimony of an expert witness; the offeror bears the burden to disclose *at any time* before trial a new or different opinion of that expert. In the present case, *defense counsel* asked Schachtsiek at his discovery deposition whether he had any other opinions relevant to the case, to which he answered "no." Although the opposing counsel *never* bears the burden of asking this question, and although my conclusion that there was a violation of Rule 220 would be the same even if defense counsel here had not asked this question, that defense counsel in fact asked that particular question and received a negative response makes the trial court's (and the majority opinion's) tolerance of plaintiff's *clear* violation of both the spirit and letter of Rule 220(d) particularly egregious.

The gamesmanship plaintiff's counsel engaged in regarding Schachtsiek is apparent on this record. At Schachtsiek's evidence deposition, plaintiff's counsel specifically asked for and received Schachtsiek's opinions regarding whether Stage 2's failure to follow security standards *caused or contributed* to plaintiff's injury. I do not believe that this was the first occasion on which plaintiff's counsel had asked that question of Schachtsiek; yet, this setting—which was the equivalent of Schachtsiek's testifying at trial—was certainly the first occasion that *defendant's* counsel ever heard such an opinion expressed.

This court should not condone or tolerate such tactics. We ought to hold that *as soon as* plaintiff's counsel had *first* asked for and learned of Schachtsiek's opinions regarding causation, Rule 220(d) required him to reveal that information to opposing counsel. Further, we should hold that the failure of plaintiff's counsel to do so results in the suppression of all of Schachtsiek's causation testimony. Having so held, we should then reverse and remand for a new trial.