HANSEL AND GRETEL DAY CARE CENTER, Appellant, v. THE INDUSTRIAL COMMISSION *et al.* (Susan A. Calvert, Appellee).

Third District (Industrial Commission Division)   No. 3—90—0860WC

Opinion filed June 26, 1991.

John A. Maciorowski, of Stevenson, Rusin & Friedman, of Chicago, for appellant.

Michael K. Brandow, Brian A. Kuehn, and Steven P. Glancy, all of Smith, Waters, Kuehn & Hughes, Ltd., of Peoria, for appellee.

JUSTICE WOODWARD delivered the opinion of the court:

Claimant, Susan A. Calvert, filed a claim for benefits from her employer, Hansel & Gretel Day Care Center. Following a hearing, the arbitrator awarded benefits including 7³/₇ weeks of temporary total disability, $3,324.45 in medical expenses and 20% loss of the use of her right leg. The Illinois Industrial Commission (Commission) upheld the arbitrator's award, and the Commission's decision was confirmed by the circuit court of Peoria County. The employer appeals. A summary of the relevant evidence appears below.

Claimant testified that she had been employed as a teacher at the Hansel & Gretel Day Care Center since 1978. Her pupils ranged in age from 2 through 5½ years. The teaching curriculum included music, art, language development and language motor skills. The teaching program was a cooperative effort but each teacher had his or her own nap room with a certain number of children depending on the size of the room.

Claimant testified that at approximately 2 p.m. on January 3, 1984, she attended a staff meeting. Claimant, who is 5 feet 6 inches and at the time of the incident weighed 155 to 160 pounds, sat at the children's table with her legs under the table, in a chair used by the children, which was smaller than a regular size chair. When she stood up, she turned her legs to the right side and lowered them a little to get them from under the table and turned them still in that position, until they were away from the table. She then sat back on the chair to stand up but when her legs were in front of her, she felt a sharp pain in her right knee, and she could not stand up. The right knee was bent at the joint, and claimant attempted to straighten it out but something in the knee was "catching." She remained seated and a little while later tried again to stand, but the pain was still there and the right knee still felt like it caught. She could not straighten the right leg. Finally, with her right knee in the bent position, she "hopped" over to awaken her pupils from their nap. She continued to work that day.

Claimant further testified that after work on January 3, 1984, she was driven to Pekin Hospital, where she was seen by her brother, Dr. Nels Calvert. Dr. Calvert and two nurses attempted to straighten out claimant's right leg, but it was not until claimant was given a shot of morphine and Valium that they were able to straighten out the right leg and place it in a cast. Claimant was also given medication for the pain.

Claimant further testified that, at the recommendation of Dr. Calvert, she saw Dr. Sombeck, who recommended surgery. Claimant wanted a second opinion and saw Dr. Steven Clark. After examining claimant, Dr. Clark also recommended surgery. Prior to the surgery, claimant underwent an arthrogram, and surgery was performed in February 1984. Following surgery, claimant attended physical therapy classes and worked out on the leg machines at the health club she belonged to.

Claimant further testified that when it is cold outside, and her left knee is uncovered, it will start to ache. When, as a substitute kindergarten teacher, she has to kneel for any length of time putting weight

on the right knee, it will begin to ache. When she tried doing aerobics again, her right knee would start to ache, or once in a while, it would feel like it was going to give. She has no further appointments with Dr. Clark.

On cross-examination, claimant testified that she had sat in the children's chairs every day and had gotten up from those chairs successfully. She admitted that there were higher chairs available for her to sit on. At the time of the incident, she used the same method of getting out of the chair that she had used on other occasions at the day care center and at other places outside the day care center.

Claimant further testified that she had had previous problems with her right knee. In 1974, she twisted both her knees playing touch football in college. She did not seek medical treatment after that incident. She denied telling Mr. Joswick from Crawford and Company that she had had problems with her right knee locking since college. She admitted telling Ms. Ward, director of the day care center, in 1978, that she had problems with her leg stiffening up since the injury in 1974. When claimant began working at the day care center in 1978, she would have difficulty with her leg because of the stiffening but it never was swollen; it would lock up but never gave out. She admitted telling Ms. Ward that she had aggravated her knee while exercising on a machine at the health club she had joined; however, she denied that her knee was swollen at that time. She limped because she had an elastic wrap on her knee to prevent further aggravation to it. She denied hurting her knee at a volleyball game in 1983. Rather, her whole body ached after the game. She did not remember complaining to Ms. Ward about her right knee in 1982 or 1983 nor did she recall any special accommodations made for her with regard to the walking she had to do at the day care center.

Claimant further testified that on January 3, 1984, she told Dr. Calvert that she had a several year history of her right knee occasionally locking. She did not recall giving him a history of walking and twisting her knee. Prior to January 1984, she had never had an arthrogram performed on her knee, and she had never seen a specialist for her knee prior to January 1984.

Ardella Ward, director of the day care center from 1975 through 1984, testified that in the fall of 1978, she observed claimant limping, and claimant informed her that her right leg was stiff and that she had had problems with her right knee since college which came and went. Thereafter, when claimant was having difficulty with her right leg, Ms. Ward would arrange to have claimant teach classes that did not require her to use the stairs and where she could remain seated.

Ms. Ward further testified that in 1982, she noticed claimant's right knee was swollen about 1½ times its normal size, and her right leg appeared to be stiff. Claimant told her it was due to either the exercise she did or the length of time she was on the machine at the health club. According to Ms. Ward, claimant saw a doctor and wore a brace on her right knee. In the summer of 1983, following a volleyball game, claimant was again limping. Between the volleyball game in 1983 and the incident of January 3, 1984, Ms. Ward did not recall anything with regard to claimant's right knee.

Ms. Ward further testified that on January 3, 1984, claimant was not directed to sit in any particular type of chair and that there were higher chairs she could have sat on. At the time of the incident, claimant and she were discussing something when claimant went to shift her weight and got a painful look on her face. Claimant stated that it was her knee again. Ms. Ward offered to stay with her, but claimant told her that the problem with her knee "comes and goes." According to Ms. Ward, claimant resumed her duties at the day care center in March 1984.

On cross-examination, Ms. Ward testified that between 1978 and 1984, claimant did not miss any days from work because of her knee although Ms. Ward attributed this to the fact that she made accommodations for claimant. Ms. Ward did not know how high the table claimant was sitting at was on the date of the incident, but it was a table low enough for the children at the day care center to sit at. Ms. Ward was unaware of anyone else having a problem upon rising from one of the chairs like the one claimant was sitting in. During the period from 1978 to 1984, claimant performed all of the duties Ms. Ward directed her to perform.

On redirect examination, Ms. Ward testified that between 1978 and January 4, 1984, she "accommodated" claimant approximately five times for a week at a time. On re-cross-examination, Ms. Ward testified that sometimes she would "accommodate" claimant as a courtesy to her or because she requested it. On occasion, she would suggest claimant sit in a larger chair. On further redirect examination, Ms. Ward testified that she suggested claimant use a larger chair because it was easier to get up and down from a larger chair.

The evidence deposition of Dr. Steven Glen Clark, a board-certified orthopedic surgeon, was admitted into evidence. He first evaluated the claimant in his office on January 9, 1984. She gave him a history of twisting her knee while arising from a chair six days previous to this time while working at the day care center. His examination of claimant's right knee revealed some slight swelling, and motion was

limited to only about 40 degrees of flexion. The swelling indicated that there had been some injury reasonably within the previous six days. Dr. Clark saw claimant again on January 16, 1984. At that time, claimant's right knee was bending better but still seemed to catch, which was a symptom of either loose bodies or torn cartilage within the knee joint. An arthrogram was performed on January 17, 1984, the results of which demonstrated a rather extensive tear of the anterior and middle horns of the lateral meniscus or lateral cartilage of the right knee. A knee arthrotomy to remove the torn cartilage was performed on February 8, 1984. In Dr. Clark's opinion, taking into consideration the type of injury and the type of work she performed, claimant was disabled from January 4, 1984, until January 18, 1984, and from February 8, 1984, until March 7, 1984, when she returned to work. Dr. Clark continued to see claimant periodically until her last visit to him on January 22, 1984, at which time claimant represented that the right knee was doing well, although there was some cold weather intolerance.

Dr. Clark opined that, even in light of claimant's prior history of right knee problems, her condition of torn lateral meniscus could have been causally related to the incident of January 3, 1984. Dr. Clark based his opinion on the emergency room history and claimant's history of occasional locking and problems with the right knee. Based upon claimant's history, she probably did have some degree of cartilage injury prior to January 3, 1984. However, it was impossible to tell exactly what happened on that date because no prior arthrogram or arthroscope had been performed. It could have been an aggravation of a cartilage tear already present, or a limited or minor tear might have been extended at the time of the injury. However, as the injury was described to him, it was certainly conceivable that another injury or certainly aggravation of an existing problem could have occurred at that time. In Dr. Clark's opinion, claimant's condition was permanent and could eventually lead to an increased incidence of a degenerative arthritic condition.

On cross-examination, Dr. Clark acknowledged that the history section of claimant's emergency room record revealed that claimant was walking and twisted her knee and had had previous knee locking but never as long as on this occasion. While Dr. Clark was aware that claimant had a history of prior problems with her knee, he had none of the specifics of that history.

According to Dr. Clark, a limp by itself was more indicative of discomfort and pain rather than a cartilage injury in the knee, unless accompanied by locking of the knee. He admitted that while claimant

had a history of her knees giving way, swelling, pain and discomfort, it was not inconsistent that claimant could have had a meniscus tear prior to January 3, 1984. There was no way to tell how long the meniscus tear present had existed. A new cartilage tear could occur as the result of a minor insult, and in light of claimant's history, her right knee could have locked, gone out or caught simply while she was walking down the street. While Dr. Calvert's notes indicated there was no effusion on January 3, 1984, it was possible that there had been swelling in December 1983 which had gone down and come back by the time Dr. Clark saw claimant on January 9, 1984.

Dr. Clark further testified that he was not familiar with claimant's work duties other than he knew she worked with small children. There was absolutely no way of determining the exact condition of the meniscus on January 2, 1984, in relation to what it was on January 3, 1984. It could have been exactly the same, or it could have been an extension of the preexisting partial tear.

On redirect examination, Dr. Clark testified that he did not know what significance to attach to the fact that, given claimant's history, she had not previously had surgery on her right knee.

The evidence deposition of Dr. James W. Milgram, a board-certified orthopedic surgeon, was admitted into evidence. Dr. Milgram testified that he examined the claimant on March 29, 1985. He took a history from the claimant, conducted a physical examination and took X rays. He also reviewed Dr. Calvert's report of July 30, 1984, the records from Pekin Hospital and the arthrogram report.

Dr. Milgram was then given a hypothetical question in which he was asked to assume the following facts: A 34-year-old female who had had problems with her right knee locking since she incurred a fall in a park when her knee went out and that she had fallen on several other occasions; that in 1982 or thereabout, she joined a health club and, after performing exercises, noted that her right knee swelled up twice its size causing discomfort; that she played volleyball and thereafter walked with a limp; that she was seen for several visits prior to January 3, 1984, for complaints of locking, swelling and pain in the right knee; that on January 3, 1984, she was attempting to get up from a chair when her right knee locked; that the emergency room history stated that she had been walking and twisted her knee, suffering pain and knee locking, which had happened before but not for this long; that an arthrogram revealed an extensive tear of the anterior and middle horns of the lateral meniscus with some medial displacement of the inner fragments; that she was admitted to the hospital with a history of multiple recurrent injuries to the right knee and un-

derwent an arthrotomy with excision of the lateral meniscus of the right knee. When last seen, she was noted to have a full range of motion and good stability.

Based upon the above hypothetical, the medical records and his own evaluation and findings, Dr. Milgram was of the opinion that there was no causal connection between the incident of January 3, 1984, and the claimant's present state of ill being in that claimant was treated for a preexisting disease which was not influenced in any significant fashion by the episode of January 3, 1984. Claimant suffered no new symptoms nor was there significant aggravation of her preexisting condition of the episode. Dr. Milgram also noted the discrepancy in the emergency room record, *i.e.*, that claimant was walking when she twisted her knee. Claimant's previous episodes of her knee locking were consistent with torn cartilage and the fact she had had previous episodes was not of any significance, and the injury could have happened at any time.

Dr. Milgram further opined that based upon her history, claimant had a torn meniscus prior to January 3, 1984, and that activities such as walking, turning or getting out of bed could have triggered symptoms involving pain, swelling and locking of the knee. Dr. Milgram also believed claimant should have had surgery long before January 3, 1984, for torn cartilage. He was doubtful that getting out of a chair would cause torn cartilage.

On cross-examination, Dr. Milgram testified that the same amount of weight is used and hence no greater strain occurs if a person rises with legs crossed as opposed to legs extended. There could be more stress on the medial aspect of the joint if the leg was crossed but claimant was complaining of lateral tenderness when the doctor examined her. While it might have been of value to have seen claimant before January 3, 1984, it would not have changed his opinion. Dr. Milgram did agree that in forming an opinion as to causal connection, there would have been some value to seeing claimant within six days of the incident of January 3, 1984. Dr. Milgram conceded that a treating doctor's opinion might have more weight than that of a nontreating doctor.

Dr. Milgram further testified that there was no significance necessarily to the fact that the locking of the right knee experienced by claimant following the January 3, 1984, injury was for a longer duration than previous episodes. He conceded that it was possible that an existing tear in the cartilage may have been extended. However, the January 3, 1984, episode was merely one in a long-term disease process that could have occurred at any particular time. Dr. Milgram was

of the opinion that the January 3, 1984, episode did not cause any permanent change in her condition. He did not know if a preexisting tear could have been worsened by the episode of January 3, 1984, because previous episodes were undocumented and because he did not believe such an injury happened on January 3, 1984. He further based his opinion on the fact that there was no bleeding which would have indicated an acute injury and then no extension of the tear took place since one would expect bleeding in the joint if it had happened. However, Dr. Milgram conceded that it was possible that there would have been no blood in the aspirated fluid a number of days after the alleged injury.

On redirect examination, Dr. Milgram testified that he did not know if his opinion would have been any different had he examined claimant six days after the incident of January 3, 1984. There was no evidence that claimant suffered anything other than locking and swelling of her knee as a result of the incident of January 3, 1984. Since these were all symptoms of torn cartilage, she had all the indications for surgery prior to January 3, 1984. In order to say that the alleged injury of January 3, 1984, caused a tear in the cartilage, he would have to have examined the knee before the claimant's injury and then after it, which was never done. The lack of bleeding dictated against there being a new injury. Given claimant's history of the injury in 1974 and the previous episodes, to say that anything serious happened while she was getting out of the chair was ridiculous.

Following a hearing, the arbitrator found that the accident of January 3, 1984, arose out of and in the course of claimant's employment and that a causal connection existed between the injury suffered by claimant on that date and her present condition of ill being. The arbitrator relied on Dr. Clark's opinion in which he stated that the injury of January 3, 1984, aggravated a preexisting condition in claimant's right knee and aggravated and extended the tear in the cartilage and that claimant's injury was permanent. On review, the Commission adopted the findings of the arbitrator and upheld the arbitrator's decision. The trial court, without comment, confirmed the Commission's decision. This appeal followed.

The employer contends that since the facts in this case are undisputed, this court is not bound by the decision of the Commission. The employer contends that as a matter of law, claimant's injury did not arise out of her employment.

■ In compensation actions, it is a function of the Commission to determine disputed issues of fact, and any factual determinations are not to be disturbed unless contrary to the manifest weight of the evi-

dence. (*Buchino v. Industrial Comm'n* (1988), 172 Ill. App. 3d 162, 164.) However, when the facts are undisputed, the issue of whether an injury arises out of and in the course of one's employment becomes a question of law, and any decisions of the Commission on questions of law are not binding on a court of review. (*Buchino*, 172 Ill. App. 3d at 165.) In the case at bar, the facts surrounding the incident of January 3, 1984, are not disputed. However, while the employer correctly points out that both doctors in this cause testified that any everyday activity could have set off claimant's current condition of ill being, each drew a different inference from those factors. Since the inference to be drawn from the facts is not undisputed, we cannot say that this cause presents only a question of law, and, therefore, we are not free to independently review this cause but must instead determine if the decision of the Commission is against the manifest weight of the evidence. Compare *Buchino*, 172 Ill. App. 3d 162.

■ More is required than the fact of an occurrence at the employee's place of work. (*Greater Peoria Mass Transit District v. Industrial Comm'n* (1980), 81 Ill. 2d 38, 43.) A claimant must show that the injury is due to a cause connected to the employment to establish that it arose out of the employment. (*Elliot v. Industrial Comm'n* (1987), 153 Ill. App. 3d 238, 242.) Although a preexisting condition does not prevent recovery of benefits if that condition was aggravated or accelerated by claimant's employment, recovery is denied where the claimant's health has so deteriorated that any normal daily activity is an overexertion, or where the activity engaged in presents risks no greater than those to which the general public is exposed. *Caterpillar Tractor Co. v. Industrial Comm'n* (1982), 92 Ill. 2d 30, 36.

■ In *Board of Trustees of the University of Illinois v. Industrial Comm'n* (1969), 44 Ill. 2d 207, the claimant, a graduate teaching assistant with a history of degenerative disc, turned in his chair and heard something "snap" in his back. He was diagnosed as having a ruptured disc which occurred when he turned in his chair. Although both the arbitrator and the Commission found that the injury had arisen out of and in the course of his employment, the circuit court disagreed and set aside the award of benefits. The supreme court affirmed the decision of the circuit court, stating as follows:

> "As we have stated, there must be a showing that an injury, to be considered compensable, was due to a cause connected with the employment or incidental to it. There is no evidence here of a causal connection between the appellant's employment and the injury. The appellant simply turned in his chair and suffered the injury. There was no suggestion that the chair

was defective or unusual in any way. The medical evidence was that because of its degenerated condition any simple and normal activity would have caused the appellant's disc to rupture. The injury was not caused by a risk attributable to employment." (44 Ill. 2d at 214-15.)

Both Dr. Clark and Dr. Milgram testified that given claimant's history of knee locking, her right knee could have locked or gone out while she was walking, turning, getting out of bed or, in short, performing the activities of everyday life. Thus, claimant has not established that she was exposed to a risk not common to the general public. See *Caterpillar Tractor Co. v. Industrial Comm'n* (1989), 129 Ill. 2d 52.

■ The burden of proof is on a claimant to establish the elements of his right to compensation, and unless the evidence considered in its entirety supports a finding that the injury resulted from a cause connected with the employment, there is no right to recover. (*Board of Education*, 44 Ill. 2d at 214.) While it is primarily the function of the Commission to determine such issues of fact, if upon consideration of all the evidence and circumstances it appears that the finding is contrary to the manifest weight of the evidence, the award must be set aside. (44 Ill. 2d at 214.) In light of the entire record before us in this cause, we conclude that the Commission's finding that the incident of January 3, 1984, aggravated claimant's preexisting condition is against the manifest weight of the evidence.

Therefore, we reverse the judgment of the circuit court.

Reversed.

McCULLOUGH, P.J., and McNAMARA, LEWIS, and STOUDER, JJ., concur.