SISBRO, INC., Appellant, v. THE INDUSTRIAL COMMISSION *et al.*
(George Rodriguez, Appellee).

Fourth District (Industrial Commission Division)   No. 4—01—0007WC

Opinion filed February 8, 2002.—Rehearing denied March 21, 2002.

RARICK, J., dissenting.

Clare R. Behrle (argued), of Valentine & Rouse, of St. Louis, Missouri, for appellant.

Charles N. Edmiston (argued), of Kanoski & Associates, of Rushville, for appellee.

JUSTICE O'MALLEY delivered the opinion of the court:
The claimant, George Rodriguez, sought benefits under the Work-

ers' Compensation Act (Act) (820 ILCS 305/1 *et seq.* (West 1998)) for a degenerative condition in his right foot that he alleged was precipitated when he twisted his ankle in disembarking from a truck on March 26, 1998, while delivering dairy products for his employer, Sisbro, Inc. (Sisbro). The arbitrator awarded claimant temporary total disability payments and medical expenses. The Industrial Commission (Commission) corrected arithmetical errors in the arbitrator's decision and awarded claimant $61^{1}/_{7}$ weeks of temporary total disability payments (TTD) at an average weekly wage of $1,152.51 and $983.65 for medical expenses. The Commission otherwise affirmed and adopted the decision. The circuit court confirmed the Commission's decision. We reverse.

## BACKGROUND

It is undisputed that on March 26, 1998, claimant twisted his right ankle when he stepped into a pothole in disembarking from his truck while delivering dairy products for Sisbro. Also undisputed is that claimant subsequently was diagnosed with a degenerative condition in his foot known as Charcot arthropathy, which prevented him from working for several weeks.

At the arbitration hearing, claimant offered the deposition testimony of Dr. Brennan Reed, a podiatrist. Dr. Reed testified that he has treated claimant for several years for foot problems related to claimant's diabetes, including ulcerations on the bottoms of the feet. Dr. Reed explained that claimant suffers from diabetic neuropathy, a condition that affects the sensory nervous system, causing decreased sensitivity in the extremities to pain and temperature and thereby weakening the individual's protective mechanism. Neuropathy involves the autonomic and muscular nervous systems as well. Dr. Reed testified that he saw claimant on April 6, 1998, for a routine preventative care appointment. At that time, claimant mentioned that he had twisted his right ankle at work and experienced pain in his foot and ankle, which had decreased since the accident. Because he saw no swelling and detected no pathology in palpating the foot, Dr. Reed decided not to X-ray it. Dr. Reed testified claimant returned to his office on April 24, 1998, complaining that he had experienced swelling and pain in the foot over the past week. Dr. Reed found that the foot was red and grossly swollen. Claimant experienced mild pain upon palpation. X rays revealed marked chronic degenerative changes involving the ankle as well as the presence of multiple osteophytes. There was marked soft tissue swelling but no evidence of acute fracture or dislocation. Dr. Reed diagnosed "acute onset of diabetic Charcot osteoarthropathy." Charcot, Reed explained, is a destruction

or breakdown of the joints in the extremities. Charcot usually is initiated by trauma. Even "very minor trauma" can initiate it. A subject suffering from decreased sensitivity due to diabetic neuropathy might develop Charcot as the consequence of "insidious" trauma, that is, trauma of which he was unaware at the time it occurred. Dr. Reed testified that he was "absolutely" sure that claimant's Charcot arthropathy was causally related to his work-related accident of March 26, 1998. Dr. Reed explained that the main treatment for Charcot arthropathy in an extremity is to decrease the amount of weight the extremity bears to avoid further deterioration.

Dr. Reed testified on cross-examination that some Charcot patients cannot recall any specific trauma that might have triggered the condition. Dr. Reed acknowledged that "really anything" can cause the trauma, even "stepping off of a curb or walking on uneven ground [or] stepping on a stone." Charcot can be caused by insidious trauma that does not leave evidence of itself—e.g., trauma associated with walking on an uneven surface. Trauma leading to Charcot can also be caused even by the subject's wearing shoes to which he is unaccustomed. Foot ulcerations like claimant has also can lead to Charcot. Asked how soon he would expect to see evidence of Charcot in a subject following trauma to the subject's foot, Dr. Reed replied, "It can be as early as immediate as far as swelling that could occur with a trauma that doesn't resolve, it just continues, or it can be as late as several weeks." Asked whether "the Charcot syndrome could have been caused by a trauma that [claimant] was unaware of because of the neuropathy problems in his foot," Dr. Reed replied in the affirmative. Asked whether "any trauma could have caused the Charcot," Dr. Reed replied in the affirmative. Dr. Reed stated that claimant could have developed the Charcot simply by "stepping off a curb" or "stepping on top of a stone." Dr. Reed admitted that Charcot arthropathy "is still somewhat of an enigma." Nonetheless, Dr. Reed maintained that claimant did not already have Charcot in his right foot at the time of the March 1998 accident.

On redirect, Dr. Reed, when asked to take into account claimant's prior history of diabetes and foot ulcerations and all examinations he performed on claimant from April 6, 1998, to the present, reiterated his opinion that, within a reasonable degree of medical certainty, claimant's Charcot arthropathy was causally related to his work-related accident of March 1998. Asked if it was more likely that claimant's Charcot arthropathy was caused by the accident in March 1998 than by some insidious trauma simply because claimant had felt the former trauma and brought it to his attention, Dr. Reed replied, "Yes."

Sisbro offered the evidence deposition of Dr. John Gragnani, who examined claimant at Sisbro's request. Dr. Gragnani testified that he specializes in physical medicine and rehabilitation and is board certified in occupational and environmental medicine. Dr. Gragnani agreed with Dr. Reed that claimant suffers from diabetic neuropathy and has Charcot arthropathy in the right ankle and foot. Dr. Gragnani explained that persons with neuropathy tend to place more stress on their joints because they have decreased sensation. A joint becomes afflicted with Charcot when it is traumatized but is not given occasion to heal because the neuropathy prevents the subject from sensing the level of stress he places on the joint. Left untreated, a Charcot joint deteriorates over time. Dr. Gragnani opined, within a reasonable degree of medical certainty, that the Charcot arthropathy in claimant's ankle could not have been caused by the March 26, 1998, accident. He explained that the advanced Charcot deterioration evidenced by X rays taken on April 24, 1998, could not have developed in only a month. Moreover, the fact that the joint was "cold" and lacked edema on that date indicated that the Charcot deterioration was not an "acute process" but a "long-standing old process." Dr. Gragnani explained that Charcot joints "don't develop in a matter of days," but over the course of "several months." Dr. Gragnani agreed with Dr. Reed that even minor trauma can result in a Charcot joint. He stated that "[w]alking around normally will cause" a person with diabetic neuropathy "eventually to develope [sic] a Charcot joint."

Dr. Gragnani also denied the possibility that claimant might have aggravated a preexisting Charcot condition by twisting his right ankle in March 1998. Dr. Gragnani explained that only a "significant injury" could have aggravated or accelerated a Charcot condition in claimant's foot. If claimant's twisting his ankle caused a "significant injury," there would have been immediate swelling and redness in the ankle, but Dr. Reed did not find evidence of injury when he examined claimant on April 6, 1998.

Acknowledging that there was conflicting expert testimony on the issue of causation, the arbitrator found Dr. Reed's testimony "more credible" than Dr. Gragnani's. The arbitrator concluded that claimant's "current of condition of ill-being, being Charcot osteoarthropathy, is causally related to his injury" at work in March 1998.

## DECISION

Sisbro does not dispute the Commission's finding of a causal connection but instead urges that the Commission "ignored the applicable standard of law" by failing to consider whether claimant's injury "falls under the general exception to compensation where recovery is

denied when a Petitioner's health is so deteriorated that any normal daily activity is an overexertion." Sisbro argues that, despite the existence of a causal connection between the accident in March 1998 and claimant's Charcot, claimant is not entitled to compensation because Drs. Reed and Gragnani agreed that even minor trauma can cause the onset of Charcot arthropathy in claimant.

■ Sisbro's statement of the law is accurate. The claimant in a workers' compensation case bears the burden of proving all elements of his claim by a preponderance of the evidence. *Parro v. Industrial Comm'n*, 260 Ill. App. 3d 551, 553 (1993). The employer takes the employee as it finds him. *County of Cook v. Industrial Comm'n*, 69 Ill. 2d 10, 17 (1977). An employer is not relieved from providing compensation by the mere fact that the condition of ill-being for which compensation is sought was brought about by a condition that preexisted the accident. *O'Fallon School District No. 90 v. Industrial Comm'n*, 313 Ill. App. 3d 413, 417 (2000). A claimant is entitled to compensation if he can demonstrate that his work-related accident was a causative factor in the aggravation or acceleration of his preexisting condition. *Johns-Manville Products Corp. v. Industrial Comm'n*, 78 Ill. 2d 171, 177 (1979). "The sole limitation to the above general rule is that where it is shown the employee's health has so deteriorated that any normal daily activity is an overexertion, *or* where it is shown that the activity engaged in presented risks no greater than those to which the general public is exposed, compensation will be denied." (Emphasis added.) *County of Cook*, 69 Ill. 2d at 18. The disjunctive indicates that there are two distinct exceptions.

The first of these two exceptions, the "normal daily activity" exception (contrasted with the "greater risk" exception), recently has been phrased alternatively as "where the employee's health has so deteriorated that any normal, daily activity *could have* caused the injury." (Emphasis added.) *General Refractories v. Industrial Comm'n*, 255 Ill. App. 3d 925, 931 (1994). Occasionally, the courts have used "would have" and "could have" interchangeably in applying this exception. For example, in *Greater Peoria Mass Transit District v. Industrial Comm'n*, 81 Ill. 2d 38, 42 (1980), the claimant's surgeon testified that even normal movement "could have" caused the claimant's shoulder to dislocate. Later in its decision, the court paraphrased the testimony, remarking that the surgeon had testified that "any normal activity *would have* precipitated [the] dislocation." (Emphasis added.) *Greater Peoria*, 81 Ill. 2d at 43. The court held that the surgeon's testimony was sufficient to satisfy the exception. *Greater Peoria*, 81 Ill. 2d at 43.

■ However, to confuse "would have" with "could have" in speak-

ing of probabilities is to confuse two distinct degrees of probability. "Could" is the past tense of "can," which is used to indicate possibility or probability. Webster's New Riverside Dictionary 105 (1984). "Would," as used in the probabilistic sense, is the past tense of "will," which indicates likelihood or certainty. Webster's New Riverside Dictionary 789 (1984). While there are cases finding the "normal daily activity" exception satisfied in testimony that such activity "would have" caused the claimant's condition of ill-being, it is clear that the probability need not be so strong to satisfy the exception. The first cases to invoke the exception found it satisfied in testimony that the claimant's condition of ill-being "could have" or "might have" been caused by normal daily activity. See, *e.g.*, *Greater Peoria*, 81 Ill. 2d at 42-43 (citing testimony that "any episode of minor trauma *** could have caused" claimant's shoulder dislocation); *County of Cook v. Industrial Comm'n*, 68 Ill. 2d 24, 33 (1977) (citing testimony that normal daily activity "would" increase the pressure on the claimant's aneurysm and "might" thereby weaken it to the point of rupture); *Illinois Bell Telephone Co. v. Industrial Comm'n*, 35 Ill. 2d 474, 475 (1966) (citing testimony that normal daily activities "might have" caused the claimant's heart attack). The trend has continued in recent cases. See, *e.g.*, *Hansel & Gretel Day Care Center v. Industrial Comm'n*, 215 Ill. App. 3d 284, 291, 293 (1991); *Pryor v. Industrial Comm'n*, 201 Ill. App. 3d 1, 4 (1990). Accordingly, we hold that a claimant is not entitled to compensation, regardless of whether his condition of ill-being was caused by work-related aggravation of a preexisting condition, if his physical condition has so deteriorated that his condition of ill-being could have been produced by normal daily activity.

Claimant suggests that this case does not involve the aggravation of a preexisting condition because Dr. Reed testified that claimant's foot was not afflicted with Charcot before the March 1998 accident. Therefore, claimant urges, his Charcot was not aggravated by that accident but constituted a "new condition" that arose from his neuropathy combined with the accident. This is at bottom a semantic objection. A myocardial infarction arising from hypertension and heart disease combined with the emotional and physical stress of a hectic day in a county government office has been held compensable even though it arguably constituted a "new condition" in the claimant's cardiovascular system. See *County of Cook v. Industrial Comm'n*, 69 Ill. 2d at 19-20. There is no more reason to believe Charcot arising from neuropathy combined with trauma is a "new condition." Accordingly, we analyze this case as involving the aggravation of a preexisting condition.

In arguing against the award of benefits, Sisbro relies primarily on

*County of Cook*, 68 Ill. 2d 24, *Greater Peoria*, 81 Ill. 2d 38, and *Hansel & Gretel*, 215 Ill. App. 3d 284. Claimant argues that the appellate court ruled for the employers in these cases only because the claimants were injured while engaged in activities that were indistinguishable in kind from normal daily activities. See *Greater Peoria*, 81 Ill. 2d at 41-42 (bending over to retrieve fallen papers); *County of Cook*, 68 Ill. 2d at 28 (rising from a chair); *Hansel & Gretel*, 215 Ill. App. 3d at 286 (same). Claimant asserts that his injury is compensable because his act of disembarking from his delivery truck was "more significant" than the work activities that gave rise to the injuries in these cases. We disagree with claimant's reading of these cases. As we will demonstrate shortly, the nature of the activities involved in these cases was such that *both* exceptions to the rule permitting compensation in preexisting condition cases applied in each case. However, the "normal daily activity" exception was sufficient by itself to bar compensation in each case.

Claimant's emphasis on the "significance" of the work activity that gave rise to his accident addresses only one of two exceptions to the preexisting condition rule. An employee whose preexisting condition was aggravated by an accident at work is not entitled to benefits "where [his] health has so deteriorated that any normal, daily activity could have caused the injury, *or* where the activity engaged in presents risks no greater than that to which the general public is exposed." *General Refractories*, 255 Ill. App. 3d at 931. Thus, despite the "significance" or intensity of the work activity that gave rise to his condition of ill-being, a claimant is not entitled to compensation if his condition of ill-being could have come about through normal daily activities. The "greater risk" and "normal daily activity" exceptions to the preexisting condition rule must not be confused with each other. Obviously, the two exceptions can be triggered by the same situation, as where the activity that causes the injury is indistinguishable from, and thus presents no greater risk than, a mundane, everyday activity that the evidence shows could have caused the injury. See, *e.g.*, *County of Cook*, 68 Ill. 2d at 28 (rising from a chair). However, the two exceptions are distinct and need not apply in the same case. A claimant can injure himself in an activity that places him at a greater risk than the general public ordinarily faces and yet not be entitled to compensation because his physical condition has deteriorated to the point that his condition of ill-being could have occurred through ordinary daily activity.

As noted above, we agree with Sisbro that *County of Cook*, *Greater Peoria*, and *Hansel & Gretel* each stand for the rule that a claimant cannot receive benefits where, due to his debilitated state, his condi-

tion of ill-being could have been caused by normal daily activities. In *County of Cook*, the claimant was a clerk in a recorder of deeds' office. Her preexisting aneurysm ruptured as she rose from her desk to go to lunch. The appellate court reversed the award of benefits, citing testimony that claimant suffered from long-term hypertension and that pressure on the aneurysm "would be increased by bending over and putting on shoes and stockings, getting in or out of bed, or any bending over below the level of the heart; and that high blood pressure alone over a period of years could eventually result in an aneurysm rupture." *County of Cook*, 68 Ill. 2d at 31. "It is apparent," the court observed, "that [the claimant's] condition had deteriorated to such an extent that any activity could have triggered the disabling episode." *County of Cook*, 68 Ill. 2d at 33. The court then proceeded to recount the claimant's testimony that she customarily used stairs, that she cleaned her apartment on weekends, and that she did her own housework, including vacuuming. These activities, the court concluded, were as strenuous as the activities that formed the claimant's work duties. *County of Cook*, 68 Ill. 2d at 33.

The court then added that claimant's rising from her chair "subjected her to no greater risk than did many of the normal daily activities which *** also increase[d] pressure on the brain." *County of Cook*, 68 Ill. 2d at 33. In our view, this invocation of the "greater risk" exception was superfluous, being occasioned by the fact that the work activity that gave rise to the claimant's accident happened to be indistinguishable from a normal daily activity and could not, therefore, present a greater risk than such an activity. The court did not imply thereby that, had the activity that gave rise to the injury exposed the claimant to a greater than normal risk, compensation would have been appropriate regardless of whether any normal daily activity could have aggravated her condition. Both exceptions to compensation in preexisting condition cases were satisfied by the facts in *County of Cook*, but the "normal daily activity" exception was sufficient in itself to bar compensation.

In *Greater Peoria*, the claimant was a bus driver. Her shoulder dislocated when she fell while bending over to retrieve bus schedules that had fallen on the floor. She had dislocated her shoulder previously and thence was subject to recurring subluxations, or partial dislocations. The appellate court acknowledged that the dislocation occurred in the course of the claimant's employment but reversed the award of benefits, citing evidence that "any normal activity would have precipitated [the] dislocation." *Greater Peoria*, 81 Ill. 2d at 43. The appellate court noted that the claimant's surgeon had testified that even "minor trauma—reaching for a cigarette or combing hair or turning over in

bed while asleep—could have caused her shoulder to dislocate." *Greater Peoria*, 81 Ill. 2d at 42. The court observed that there was no evidence in the record that the claimant's work "(1) further deteriorated her shoulder, (2) aggravated it, (3) precipitated its dislocation, or (4) accelerated the occasion for its dislocation." *Greater Peoria*, 81 Ill. 2d at 43. In other words, the court explained, there was "no indication from the record that, but for her employment, [the claimant's] shoulder would 'have gone on functioning reasonably well for an indefinite time.' " *Greater Peoria*, 81 Ill. 2d at 43, quoting 1 A. Larson, Workmen's Compensation § 12.20, at 3—310 (1978). The court added at the close of its opinion that "neither qualitative nor quantitative risks to the claimant were shown to be greater as a result of her employment." *Greater Peoria*, 81 Ill. 2d at 43.

In our view, it was sufficient for the *Greater Peoria* court's resolution of the case that the claimant's condition of ill-being could have been caused by normal daily activity. The fact that claimant was injured while bending over to retrieve fallen papers, a movement not different in kind from those occurring in the normal activities of daily life, was a collateral fact. The court's application of the "greater risk" exception at the end of its opinion simply reflected the fact that both exceptions to compensation in preexisting condition cases were satisfied by the facts before the court. Nowhere did the court suggest that, had the claimant been exposed to a greater-than-normal risk, compensation would have been appropriate regardless of whether any normal daily activity could have aggravated her condition.

In *Hansel & Gretel*, the claimant's right knee became locked as she rose from her chair. The appellate court reversed the award of benefits, citing testimony that, due to a preexisting condition, claimant's knee "could have locked or gone out while she was walking, turning, getting out of bed or, in short, performing the activities of everyday life." *Hansel & Gretel*, 215 Ill. App. 3d at 294. Like the courts in *Greater Peoria* and *County of Cook*, the court remarked at the close of its analysis that the claimant had not "established that she was exposed to a risk not common to the general public." *Hansel & Gretel*, 215 Ill. App. 3d at 294. As with like remarks in *Greater Peoria* and *County of Cook*, we view this discussion of the "greater risk" exception as an alternative basis for denying claimant compensation. The "normal daily activity" exception was sufficient by itself to bar compensation.

Claimant submits that *General Refractories*, 255 Ill. App. 3d 925, departs from the rule that aggravation of a preexisting condition is not compensable if it could have been caused by normal daily activity. Claimant suggests that *General Refractories* shows that "[t]he fact

that other hypothetical non-work-related causes may exist for a condition does not require that the Commission deny benefits." We disagree. In *General Refractories*, the claimant aggravated a preexisting herniated disc in his spine. Upholding an award of compensation, the appellate court wrote:

"While it is true that Dr. Rutkowski testified that there were a number of routine life activities which could have exacerbated Burgett's condition, he specifically stated that the October 30, 1990, accident was itself sufficient to produce Burgett's current condition, and opined that this accident resulted in an aggravation of the disc and a corresponding irritation of the S1 nerve root, and was the ultimate cause of Burgett's surgery. Based upon Dr. Rutkowski's testimony, the Commission specifically found that Burgett's back was not so deteriorated that any normal activity was an overextension which could have caused the injury. This finding was also based upon the fact that prior to the October 30, 1990, accident, Burgett was performing heavy manual labor with no apparent difficulty, but was unable to do so afterwards without suffering severe distress. Again, we cannot say that this finding was against the manifest weight of the evidence." *General Refractories*, 255 Ill. App. 3d at 931.

*General Refractories* is consistent with the *County of Cook* line of cases. As in those cases, the appellate court in *General Refractories* recognized and applied the exceptions to the preexisting condition rule. In affirming the award of compensation, the court deferred to the Commission's finding that the claimant's condition was not so deteriorated that *any* normal activity could have aggravated his back. This finding, we note, was consistent with the testimony of the expert, Dr. Rutkowski, who asserted not that *any* routine life activity could have exacerbated the claimant's condition but only that *a number* of routine life activities could have exacerbated it. *General Refractories*, we conclude, did not depart from the rule of *County of Cook* and its progeny.

We recognize there have been departures from the *County of Cook* line of cases. For instance, in *Mason & Dixon Lines, Inc. v. Industrial Comm'n*, 99 Ill. 2d 174 (1983), claimant's diabetes-induced gangrene in his foot was aggravated when a heavy cart rolled over the foot. The spread of the gangrene ultimately necessitated the amputation of the foot. There was expert testimony that any trauma to the foot could have aggravated the preexisting gangrene and that the natural progression of the diabetic condition could have led to amputation regardless of any trauma to the foot. Nonetheless, the supreme court affirmed an award of compensation with the following reasoning:

"That the same consequences of a preexisting disease might have

resulted in the absence of an accident is not the test. (*County of Cook v. Industrial Com.* (1977), 69 Ill. 2d 10, 17-18.) The appropriate inquiry is not whether the amputation of claimant's feet would have ultimately been required due to his diabetic condition; rather, it is whether the accident aggravated his condition or accelerated the processes which led to the amputation." *Mason & Dixon*, 99 Ill. 2d at 181-82.

This reasoning is inconsistent with *County of Cook* and later cases because the court did not even mention the exceptions to compensation in preexisting condition cases.

*Mason & Dixon* relied on *County of Cook*, 69 Ill. 2d 10, decided subsequent to the *County of Cook* case, 68 Ill. 2d 24, discussed above. In the later *County of Cook* case, the claimant's husband, a clerical worker in a county treasurer's office, suffered a fatal heart attack. The court affirmed an award of compensation despite testimony that, due to preexisting heart disease, the decedent could have suffered a heart attack even if he was not working. The court explained that "[t]he mere fact that an employee might have suffered a fatal heart attack, even if not working, is immaterial, for the question before the Commission is whether the work that was performed constituted a causal factor." *County of Cook*, 69 Ill. 2d at 17-18. The court then recited the two exceptions to compensation in preexisting conditions cases but discussed only the "greater risk" exception. The court did not address, even in passing, whether the evidence showed that decedent could have suffered a heart attack as a result of normal daily activity.

We view *Mason & Dixon* and the later *County of Cook* case as isolated departures from an otherwise consistent approach to preexisting condition cases. The majority rule is reflected in the earlier *County of Cook* case and other cases that take full note of both exceptions to the rule permitting compensation for aggravation of a preexisting condition. See, *e.g.*, *Smith's Transfer Corp. v. Industrial Comm'n*, 76 Ill. 2d 338 (1979); *Illinois Bell Telephone Co. v. Industrial Comm'n*, 35 Ill. 2d 474 (1966); *Cassens Transport Co. v. Industrial Comm'n*, 262 Ill. App. 3d 324 (1994); *Komatsu Dresser Co. v. Industrial Comm'n*, 235 Ill. App. 3d 779 (1992).

■ There is no dispute that claimant suffers from diabetic neuropathy, which predisposes him to Charcot arthropathy. Claimant's own expert, Dr. Reed, testified that "really anything" can cause Charcot in an individual suffering from diabetic neuropathy. He testified that Charcot can develop through even minor, insidious foot trauma such as wearing uncomfortable shoes, stepping off a curb, or walking on an uneven surface. Dr. Gragnani testified that even the stress of normal walking "will *** eventually" cause Charcot. Asked

whether "the Charcot syndrome could have been caused by a trauma that [claimant] was unaware of because of the neuropathy problems in his foot," Dr. Reed replied in the affirmative. Asked whether "any trauma could have caused the Charcot," Dr. Reed again replied in the affirmative. Thus, not only did Drs. Reed and Gragnani agree that Charcot generally can be caused by normal daily activities, Dr. Reed explicitly stated that *claimant's* Charcot could have been caused by "any trauma."

The arbitrator found that claimant's accident of March 1998 caused his Charcot but did not consider whether claimant nonetheless should be barred from compensation in light of uncontradicted testimony that normal daily activity was sufficient to cause Charcot in claimant. Nor did the Commission, in reviewing the findings of the arbitrator, consider either of the two exceptions to the rule permitting compensation for work-related aggravation of a preexisting condition. Because we determine that this case falls into one of those exceptions, we hold that the Commission's award of compensation was against the manifest weight of the evidence.

For the reasons provided above, the judgment of the circuit court of Adams County confirming the Commission's decision is reversed.

Reversed.

McCULLOUGH and HOFFMAN, JJ., concur.

JUSTICE RARICK, dissenting:

I must dissent. One of the most basic premises in workers' compensation law is that it is *solely* within the province of the Commission to judge the credibility of witnesses, resolve conflicting medical testimony and determine the weight evidence is to be given. See, *e.g.*, *O'Dette v. Industrial Comm'n*, 79 Ill. 2d 249, 253, 403 N.E.2d 221, 223-24 (1980); *Caterpillar, Inc. v. Industrial Comm'n*, 228 Ill. App. 3d 288, 291, 591 N.E.2d 894, 896 (1992). We are not to reject permissible inferences drawn by the Commission or substitute our judgment for that of the Commission merely because other inferences could also be drawn. *Wagner Castings Co. v. Industrial Comm'n*, 241 Ill. App. 3d 584, 594-95, 609 N.E.2d 397, 405 (1993). Yet, this is exactly what the majority is doing, impermissibly substituting its judgment for that of the arbitrator, the Commission and the circuit court. The majority seems to assert we must reverse the Commission's decision because the Commission erred in failing to consider whether claimant's injury fell under the exception to compensation for health so deteriorated that any normal daily activity is an overexertion. The majority misses

the mark. This very issue was included in employer's statement of exceptions and argued before the Commission. The determination of whether a claimant's health has so deteriorated is a question of fact for the Commission to decide. *Caterpillar Tractor Co. v. Industrial Comm'n*, 92 Ill. 2d 30, 36-37, 440 N.E.2d 861, 864 (1982). The Commission, by awarding benefits, found the exception not applicable in this instance. Dr. Reed could not have been more emphatic that the onset of claimant's Charcot osteoarthropathy was causally related to his work-related accident. It does not matter that other incidents *could* have caused the onset; what is important is what caused it here. Claimant's condition was triggered by stepping out of an 18-wheeler into a pothole attempting to make a delivery. This was not an everyday occurrence to which the general public is routinely exposed like taking off one's coat (see *Branch v. Industrial Comm'n*, 95 Ill. 2d 268, 447 N.E.2d 828 (1983)), twisting in a chair (see *Board of Trustees of the University of Illinois v. Industrial Comm'n*, 44 Ill. 2d 207, 254 N.E.2d 522 (1969)) or bending over to pick up papers (see *Greater Peoria Mass Transit District v. Industrial Comm'n*, 81 Ill. 2d 38, 405 N.E.2d 796 (1980)). Nor does it matter that claimant may have already been suffering from foot problems if his condition was aggravated or accelerated by the employment-related accident. See *Caterpillar Tractor Co.*, 92 Ill. 2d at 36, 440 N.E.2d at 864. These were all questions for the Commission to resolve, and the Commission resolved them in claimant's favor. The Commission specifically accepted Dr. Reed's testimony, the treating physician, and found the testimony of employer's expert, who only saw claimant once and whose practice consists almost entirely of employment- and insurance-related examinations, less credible. Again, it is the Commission's function, not ours, to choose between conflicting medical opinions. And, not only may the Commission decide which medical view is to be accepted, it may attach greater weight to the opinion of the treating physician. *International Vermiculite Co. v. Industrial Comm'n*, 77 Ill. 2d 1, 4, 394 N.E.2d 1166, 1168 (1979); *ARA Services, Inc. v. Industrial Comm'n*, 226 Ill. App. 3d 225, 232, 590 N.E.2d 78, 82 (1992). The majority clearly has forgotten the principle that the Workers' Compensation Act was designed to protect all workers, whether they be healthy or ill, and compensate them for injuries incurred while working. I believe claimant is entitled to compensation in this instance, and therefore, I must dissent.

JUSTICE HOLDRIDGE joins in this dissent.